UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE TELECOMMUNICATIONS ASSOCIATION, INC., CTIA – THE WIRELESS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, NTCA – THE RURAL BROADBAND ASSOCIATION, and SATELLITE BROADCASTING & COMMUNICATIONS ASSOCIATION, on behalf of their respective members,<br><br>      Plaintiffs,<br><br>  v.<br><br>LETITIA A. JAMES, in her official capacity as Attorney General of New York,<br><br>      Defendant. | Case No. 21-cv-2389 |

**COMPLAINT FOR DECLARATORY JUDGMENT AND
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

  Plaintiffs New York State Telecommunications Association, Inc. ("NYSTA"), CTIA – The Wireless Association ("CTIA"), ACA Connects – America's Communications Association ("ACA Connects"), USTelecom – The Broadband Association ("USTelecom"), NTCA – The Rural Broadband Association ("NTCA"), and Satellite Broadcasting & Communications Association ("SBCA") (collectively, the "Associations"), bring this suit on behalf of their members for declaratory judgment and preliminary and permanent injunctive relief against Defendant Letitia A. James, in her official capacity as Attorney General of New York, stating as follows:

## NATURE OF THE CASE

1. "Today, access [to the Internet] is generally furnished through 'broadband,' i.e., high-speed communications technologies." *Verizon v. FCC*, 740 F.3d 623, 629 (D.C. Cir. 2014). Broadband service "transmits data at much higher speeds" than preexisting technologies, such as dial-up connections provided over local telephone facilities. *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005).

2. Under federal law, broadband Internet access service ("broadband") is an interstate information service that is subject to a federal regulatory framework, under which a combination of mandatory disclosures, competition, and federal and state enforcement of preexisting laws benefit consumers. The Federal Communications Commission ("FCC") has consistently — both in 2015 when it regulated broadband as a common-carrier service and in 2018 when it re-established the current, non-common-carrier federal framework — rejected *ex ante* rate regulation for broadband. Indeed, the broadband service that New York seeks to regulate has *never* been subject to rate regulation at the federal or state level.

3. Broadband providers recognize the need to close the "digital divide" and to ensure that broadband is both available and accessible to all Americans, including low-income households. In addition to continuing to build out their networks to reach underserved communities, broadband providers have developed their own, lower-priced offerings specifically designed for low-income households. In addition, broadband providers participate in federal programs that provide subsidies to make broadband more affordable. These include both established programs like Lifeline and the newly created Emergency Broadband Benefit, which takes effect on May 12, 2021. More than 50 broadband providers in New York are making broadband available to low-income households in New York through the Emergency Broadband Benefit. New York recognizes that, as a result of providers' offerings and these federal

programs, there are already "multiple options" for New Yorkers to purchase "affordable internet plans."  Find Affordable Internet Options in New York State, https://forward.ny.gov/find-affordable-internet-options-new-york-state (listing available options throughout the state).

4. New York, however, now seeks to regulate broadband rates.  A provision of the recently enacted New York State Fiscal Year 2022 Budget requires wireline, fixed wireless, and satellite broadband providers — no later than June 15, 2021 — to begin offering to qualifying low-income consumers high-speed broadband service at a cost to consumers of $15 per month or higher-speed broadband service at a cost to consumers of $20 per month (the "Rate Regulation").

5. Both an FCC order that the D.C. Circuit upheld and the federal Communications Act preclude New York from regulating broadband rates.  The Court should declare that New York's Rate Regulation is preempted and should permanently enjoin Defendant from enforcing or giving effect to it.[1]

6. First, New York's Rate Regulation conflicts with the FCC's 2018 decision, which the D.C. Circuit upheld in relevant part, that broadband is an interstate information service that should not be subject to common-carrier regulation.  The Rate Regulation conflicts with that decision, as well as the Communications Act, by compelling providers to offer broadband on a common-carrier basis:  at state-set rates and terms to all eligible members of the public.

7. Second, New York's Rate Regulation intrudes into an exclusively federal field.  More than a century ago, Congress enacted legislation that occupied the field of interstate communications service and, thereby, precluded states from directly regulating those services.  In violation of that long-standing law, the Rate Regulation expressly seeks to set the rates and

---

[1] The Associations will be filing a Motion for Preliminary Injunction based on the immediate, irreparable harm that the Rate Regulation threatens to impose.

speed of an interstate communications service. No state has ever successfully engaged in such regulation.

8. In short, New York has overstepped its regulatory authority. The Rate Regulation is preempted under both conflict and field preemption principles.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Associations' claims arise under the laws of the United States, including the Communications Act, 42 U.S.C. § 1983, and the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2. This Court has equitable jurisdiction to enjoin actions by state officials that are preempted by federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (citing *Ex parte Young*, 209 U.S. 123, 150-51 (1908)).

10. Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

11. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the Associations' claims occurred in this district. Several members of the Plaintiff Associations provide services in this district, residents of this district qualify for the mandated reduced costs under the Rate Regulation, and Defendant operates two regional offices in this district.

## PARTIES

12. Plaintiff NYSTA is a non-profit association that represents New York's telecommunications industry along with the equipment and service companies that assist them. NYSTA's membership includes telecommunications providers throughout the state, ranging from larger national firms to smaller in-state providers. NYSTA advocates for its members in

4

New York State government, provides numerous venues for membership interaction, and hosts educational programs regarding issues of importance to its members.

13.     Plaintiff CTIA is a non-profit association that represents the wireless communications industry.  Members of CTIA include mobile and fixed wireless broadband Internet service providers operating in New York and throughout the country, as well as providers of other wireless services, device manufacturers, and other wireless industry participants.

14.     Plaintiff ACA Connects is a non-profit association representing more than 600 small and medium-sized broadband providers around the country.  ACA Connects members — including the 16 members that provide service in New York — often operate in smaller markets and rural areas, where they provide communications services, including video and voice, to homes and businesses that are crucial to the economic prosperity of the communities they serve.

15.     Plaintiff USTelecom is a non-profit association representing service providers and suppliers for the telecom industry.  USTelecom members provide a full array of services, including broadband, voice, data, and video over wireline and wireless networks.  Its diverse member base ranges from large publicly traded communications corporations to small companies and cooperatives — providing advanced communications services to both urban and rural markets across the country, including in New York.

16.     Plaintiff NTCA is a non-profit association representing nearly 850 independent, community-based telecommunications companies that operate in rural and small-town America, including 17 providers that operate in rural areas of New York.  NTCA advocates on behalf of its members in the legislative and regulatory arenas, and it provides training and development; publications and industry events; and an array of employee benefit programs.

17. Plaintiff SBCA is a non-profit association that represents the consumer-based satellite industry. Members of SBCA include satellite Internet service providers operating in New York and throughout the country, as well as providers of other wireless services, independent retailers, and other industry participants.

18. The Associations have standing to bring the claims asserted in this Complaint on behalf of their members because: (a) the subject matter of this suit is germane to the Associations' purpose; (b) members of the Associations would have standing on their own to bring these claims, given the substantial harms that members face if the invalid state measure at issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires the participation of the Associations' individual members in this lawsuit.

19. Defendant Letitia A. James is the Attorney General of New York. Pursuant to Article V, Section 4 of the New York Constitution, she is the "head . . . of the department of law" of New York's state government. N.Y. Const. art. V, § 4. She is sued in her official capacity only.

20. Section 63 of New York's Executive Law gives the Attorney General broad authority to enforce New York law. *See* N.Y. Exec. Law § 63(1) (providing that the Attorney General shall "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state"); *id.* § 63(12) ("Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts . . . .").

21. The newly enacted Rate Regulation also confers explicit enforcement authority on the Attorney General.  *See* NYS Budget Bill S2506-C, Part NN, section 1 (signed Apr. 16, 2021) (new § 399-zzzzz, ¶ 10) (Ex. A) ("Whenever there shall be a violation of this section, an application may be made by the attorney general in the name of the people of the state of New York to a court or justice having jurisdiction by a special proceeding to issue an injunction . . . to enjoin and restrain the continuance of such violation.").

22. The Governor of New York has promised vigorous enforcement of the Rate Regulation, warning broadband providers that they "operate in the State of New York by the will of the people" and that if they do not comply with the Rate Regulation, "you will lose your franchise in the State of New York and that's a promise."  N.Y. Governor Andrew Cuomo Transcript of April 7, 2021 Press Conference, https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-cuomo-presents-highlights-fy-2022-budget-reimagine.

23. New York estimates that 2.7 million households — more than 35% of households in the state — will qualify for discounted broadband service under the Rate Regulation.[2]  One category of households the Rate Regulation covers is households eligible for free or reduced-priced lunch through the National School Lunch Program.  The Department of Agriculture has recently announced that *all* households with students are eligible for free and reduced-price

---

[2] *See* Governor Cuomo Signs Legislation Establishing First-in-the-Nation Program to Provide Affordable Internet to Low-Income Families, https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-establishing-first-nation-program-provide-affordable-internet; U.S. Census Bureau QuickFacts:  New York, https://www.census.gov/quickfacts/NY (7.3 million households in New York as of July 1, 2019).

lunches throughout the 2021-22 school year.[3]  It is unclear whether the additional households temporarily eligible under this federal program will also be eligible under the Rate Regulation.

## STATEMENT OF FACTS

### *New York Seeks To Regulate Broadband Rates and Speeds*

24.     On April 16, 2021, New York Governor Andrew Cuomo signed NYS Budget Bill S2506-C.

25.     Section 1 of Part NN of that Bill enacts a new section of New York's General Business Law.  *See* Ex. A.  This new section requires providers of "broadband service" — within 60 days (or by June 15, 2021) — to offer one of two high-speed broadband services to certain low-income customers:  (1) a service that provides Internet access with a download speed of at least 25 Mbps at a cost of no more than $15 per month, including any recurring taxes and fees;[4] or (2) a service that provides Internet access with a download speed of at least 200 Mbps at a cost of no more than $20 per month, including any recurring taxes and fees.  *See id.* (new § 399-zzzzz, ¶¶ 2-4).

26.     The statute defines "broadband service" as "a mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service provided by a wireline, fixed wireless or satellite service provider," but not including dial-up service.  *Id.* (new § 399-zzzzz, ¶ 1).  The Rate Regulation governs every

---

[3] *See* USDA Issues Pandemic Flexibilities for Schools and Day Care Facilities through June 2022 to Support Safe Reopening and Healthy, Nutritious Meals, https://www.usda.gov/media/press-releases/2021/04/20/usda-issues-pandemic-flexibilities-schools-and-day-care-facilities.

[4] The New York Public Service Commission is authorized to adopt exceptions "where such download speed is not reasonably practicable."  Ex. A (new § 399-zzzzz, ¶ 2).

8

provider of wireline, fixed wireless, or satellite broadband service. *See id.* (new § 399-zzzzz, ¶ 2).

27. The Rate Regulation also limits broadband providers' ability to increase the rates the statute sets. Providers who offer the service capped at a cost of $15 per month may increase their rates only once every five years, while providers who offer the service capped at a cost of $20 per month may increase their rates only once every two years. Any rate increases for either service must occur on 30 days' notice and are limited by the most recent change in the consumer price index, up to a maximum of two percent per year of the price of the service. *See id.* (new § 399-zzzzz, ¶¶ 3-4).

28. Providers must also allow low-income subscribers to purchase broadband service on a standalone basis, separate from any phone or television service. *See id.* (new § 399-zzzzz, ¶ 3). And other than the cost and speed the Rate Regulation mandates, providers must offer the regulated service under the same terms and conditions that apply to their regularly priced broadband offerings. *See id.* (new § 399-zzzzz, ¶ 6).

29. The Rate Regulation exempts a broadband provider that provides service to fewer than 20,000 households, but only if the New York Public Service Commission determines that compliance with the Rate Regulation would result in an unreasonable or unsustainable financial impact on that provider. *See id.* (new § 399-zzzzz, ¶ 5). On April 26, 2021, the New York Department of Public Service's staff issued a one-page guidance document listing certain information that providers must include in any requests for exemption. http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={B6EB9B7A-BC29-4EC7-8B95-47F4F6CEC1F6}.

30. Broadband providers must also make all commercially reasonable efforts to advertise the availability of broadband service for low-income consumers at the cost the Rate Regulation mandates. *See* Ex. A (new § 399-zzzzz, ¶ 7).

31. Finally, the Attorney General has authority to enforce the Rate Regulation by seeking to enjoin any violation of its terms. Courts may also impose a $1,000 civil penalty for any such violation. *See id.* (new § 399-zzzzz, ¶ 10).

### *Federal Law Preempts New York's Rate Regulation*

32. The federal government has taken multiple actions to protect the public interest through programs to aid low-income consumers in obtaining low-cost broadband service through direct subsidies.

33. First, the federal Lifeline program has since 2016 subsidized broadband service for qualifying low-income consumers. Qualifying customers can receive $9.25 per month toward their purchase of broadband service. Households containing at least one person who participates in the SNAP, Medicaid, SSI, federal public housing assistance, or Veterans Pension benefit programs, or certain Tribal programs, qualify for Lifeline support, as do households with income less than 135 percent of the federal poverty level. The FCC has created a National Verifier to enable providers to quickly and accurately determine who qualifies for the program.

34. Second, in December 2020, Congress created a $3.2 billion Emergency Broadband Connectivity Fund, which the FCC administers through the Emergency Broadband Benefit. On April 29, 2021, the FCC announced that the Emergency Broadband Benefit will go into effect on May 12, 2021. *See* FCC, Wireline Competition Bureau Announces Emergency Broadband Benefit Program Launch Date, DA 21-493 (Apr. 29, 2021), https://docs.fcc.gov/public/attachments/DA-21-493A1.pdf. More than 50 broadband providers in New York have already confirmed that they will participate in the Emergency Broadband Benefit. *See* FCC,

Emergency Broadband Benefit Providers, https://www.fcc.gov/emergency-broadband-benefit-providers#New%20York.  Qualifying households can receive a subsidy of up to $50 per month (and up to $75 month in Tribal areas) from participating providers for their broadband service, as well as a one-time $100 benefit toward a computer or tablet.  Participating providers are eligible to receive reimbursement for offerings that were available as of December 1, 2020.  Qualifying households include those that have at least one member who is eligible for Lifeline, are approved to receive benefits under the free and reduced-price school lunch program, have experienced a substantial loss of income since the start of the COVID-19 pandemic, or have received a federal Pell Grant in 2021.  And households may receive both the Emergency Broadband Benefit and the Lifeline subsidy.  The FCC has expanded its National Verifier so that providers can quickly and accurately determine who is eligible for the Emergency Broadband Benefit.

35. Third, the American Rescue Plan enacted in March 2021 includes a $7.17 billion Emergency Connectivity Fund.  The FCC has 60 days in which to promulgate regulations to implement this additional fund, which is to be used by schools and libraries for the purchase of computer equipment or broadband service, including for use by students or library patrons at home or at other locations outside of schools and libraries.

36. These federal programs, together with broadband providers' specially designed lower-priced offerings, further the public interest in ensuring that broadband is both available and accessible to low-income households.  Indeed, New York itself has recognized that — before the Rate Regulation takes effect — there are already "multiple options" for New Yorkers to purchase "affordable internet plans."  Find Affordable Internet Options in New York State, https://forward.ny.gov/find-affordable-internet-options-new-york-state.

37. Federal law preempts the Rate Regulation, under both conflict preemption and field preemption doctrines. The Rate Regulation conflicts with the FCC's 2018 Order[5] concluding that common-carrier regulation of broadband is contrary to the public interest and with the Communications Act's prohibition against subjecting information services to common-carrier regulation. The Rate Regulation also impermissibly regulates in a field occupied by the federal government through the Communications Act.

38. **Conflict Preemption.** Under the Supremacy Clause, a state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The Rate Regulation stands as an obstacle to effectuating the FCC's determination that broadband should be subject to a light-touch regulatory approach, as well as Congress's determination that information services should not be subject to common-carrier regulation.

39. First, in its 2018 Order, the FCC ended the temporary federal regulation of broadband as a common-carrier service. *See* 47 U.S.C. § 153(51). The FCC explained that its classification was driven in large measure by its policy view that rejecting common-carrier regulation "is more likely to encourage broadband investment and innovation," while common-carrier regulation of broadband had "resulted . . . in considerable social cost, in terms of foregone investment and innovation," while having "no discernable incremental benefit." 2018 Order ¶¶ 86-87. The FCC also specifically identified "rate regulation" as a harmful and "costly regulation" that should not be applied to broadband. *See id.* ¶ 101.

---

[5] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("2018 Order"), *pet. for rev. granted in part*, *denied in part*, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam).

40. Notably, even in the 2015 Order,[6] when the FCC had deemed it appropriate to regulate broadband as an interstate common-carrier service, the FCC explicitly rejected *ex ante* rate regulation for broadband, stating that "there will be no rate regulation" of broadband and that the Commission "cannot envision adopting new *ex ante* rate regulation of broadband . . . in the future." 2015 Order ¶¶ 382, 451.

41. The D.C. Circuit upheld the FCC's policy-based grounds for its 2018 Order, *see Mozilla*, 940 F.3d at 49-55, and so they form a valid predicate for conflict preemption, *see, e.g., Geier v. American Honda Motor Co.*, 529 U.S. 861, 874-75, 878 (2000) (state law preempted because it raised an obstacle to achieving the agency's judgment as to the optimal mix of regulatory measures). The Rate Regulation directly conflicts with these policy judgments.

42. Indeed, in attempting to regulate broadband service, the Rate Regulation employs the same definition that the FCC has historically used in identifying the interstate broadband services subject to federal regulation. *Compare* Ex. A (new § 399-zzzzz, ¶ 1) (defining "broadband service" as "a mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints"), *with* 2018 Order ¶ 21 (same); 2015 Order ¶ 25 (same).

43. Because the Rate Regulation directly undermines the FCC's policy judgments regarding the appropriate regulatory approach for broadband, it stands as an obstacle to effectuating the FCC's regulatory objectives and is therefore preempted. *See, e.g., Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 708 (1984) (state law preempted where it created "a result [that] is wholly at odds with the regulatory goals contemplated by the FCC").

---

[6] Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("2015 Order").

44. Second, the Rate Regulation conflicts with Congress's determination in the Communications Act that "[a] telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services." 47 U.S.C. § 153(51). The D.C. Circuit has recognized that this provision represents a "statutory prohibition[] on common carrier treatment" of information services. *Verizon*, 740 F.3d at 650.

45. As noted above, broadband is an information service. *See* 2018 Order ¶¶ 2, 18, 65. Broadband providers are therefore exempt from common-carrier regulation under federal law. *See Verizon*, 740 F.3d at 650 (finding it "obvious that the Commission would violate the Communications Act were it to regulate broadband providers as common carriers," given the Commission's decision to "classify broadband providers . . . as providers of 'information services'").

46. Yet the Rate Regulation subjects broadband to a *per se* form of common-carrier regulation: rate regulation. To begin with, the very enterprise of rate regulation is a quintessential feature of common-carrier regulation that is "utterly central" to the common-carrier provisions of the Communications Act governing telecommunications services. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 230-32 (1994).

47. Moreover, "the basic characteristic" of common carriage is the "requirement of holding oneself out to serve the public indiscriminately," while leaving no "room for individualized bargaining." *Verizon*, 740 F.3d at 651-52. The Rate Regulation has just that effect, requiring broadband providers to make their services available to a statutorily defined segment of the general public at a cost set by statute and on mandated terms and conditions.

14

48. The Rate Regulation would thus treat broadband — an information service — as a common-carrier service contrary to Congress's judgment as reflected by 47 U.S.C. § 153(51). *See Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) (a federal determination that the area is best left "*un*regulated" carries "as much pre-emptive force as a decision *to* regulate").

49. **Field Preemption.** Under the Supremacy Clause, a state law is preempted where "Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005)).

50. Congress has occupied the field of interstate communications services, which includes interstate information services, for more than a century. As the Second Circuit has recognized, "[t]he Supreme Court has held that the establishment of this broad scheme for the regulation of interstate service" in the Communications Act and its predecessors "indicates an intent on the part of Congress to occupy the field to the exclusion of state law." *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490-91 (2d Cir. 1968) (collecting cases).

51. The Communications Act "appl[ies] to all interstate . . . communication by wire or radio," while denying the FCC "jurisdiction with respect to . . . intrastate communication service by wire or radio." 47 U.S.C. § 152(a)-(b). Section 152 thus "divide[d] the world . . . into two hemispheres — one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986).

52. Broadband is an interstate communications service because the servers that contain the content customers access and enable the services customers use via the Internet are geographically dispersed across the nation and around the world. Both the FCC and federal courts have repeatedly and consistently held over the course of more than two decades that broadband is an interstate communications service. *See*, *e.g.*, 2018 Order ¶ 199 (citing precedent); *USTelecom Ass'n v. FCC*, 825 F.3d 674, 730-31 (D.C. Cir. 2016) (same); Memorandum Opinion and Order, *NARUC Petition for Clarification or Declaratory Ruling*, 25 FCC Rcd 5051, ¶ 8 n.24 (2010) (broadband is "properly considered jurisdictionally interstate for regulatory purposes").

53. Because broadband service "qualifies as 'interstate and foreign communication by wire' within the meaning of Title I of the Communications Act," *Comcast Corp. v. FCC*, 600 F.3d 642, 646-47 (D.C. Cir. 2010) (quoting 47 U.S.C. § 152(a)), it is subject to the "centraliz[ed] authority" of the FCC, 47 U.S.C. § 151, and states lack the authority to regulate it.

54. The Rate Regulation expressly seeks to regulate an interstate communications service. *See* Ex. A (new § 399-zzzzz, ¶ 1) (defining "broadband service" as "a mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints"). Because the law purports to regulate directly an interstate communications service — and to regulate core terms of that service, including its cost and speed — it intrudes into the field that Congress intended the FCC to occupy and is accordingly preempted. *See* 47 U.S.C. § 152(a)-(b); *New York SMSA*, 612 F.3d at 105.

### FIRST CLAIM FOR RELIEF

*Declaratory Judgment That Federal Law Preempts the Rate Regulation*

55. The allegations of paragraphs 1 through 54 above are incorporated as though fully set forth herein.

56. The Rate Regulation is preempted because it conflicts with both the 2018 Order and the Communications Act. Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state laws that contravene validly enacted federal laws or federal agency orders are preempted and have no force or effect.

57. The Rate Regulation is independently preempted because it regulates in a field that federal law exclusively occupies. Congress granted the FCC exclusive regulatory authority over interstate communications services, and expressly denied such authority to the states. *See* 47 U.S.C. §§ 151, 152. State laws that attempt to regulate in a field so occupied have no force or effect.

58. There is an actual controversy within the jurisdiction of this Court about the legality of the Rate Regulation.

## SECOND CLAIM FOR RELIEF

### *Declaratory Judgment That Enforcement of the Rate Regulation Would Violate 42 U.S.C. § 1983*

59. The allegations of paragraphs 1 through 58 above are incorporated as though fully set forth herein.

60. For the reasons noted above, the Rate Regulation is preempted by federal law, and its enforcement against the Associations' members would violate the Supremacy Clause of the United States Constitution.

61. New York's enforcement of the Rate Regulation will therefore deprive the Associations' members of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

62. There is an actual controversy within the jurisdiction of this Court about whether enforcement of the Rate Regulation would violate 42 U.S.C. § 1983.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. A declaration and judgment pursuant to 28 U.S.C. § 2201 that the Rate Regulation is preempted by federal law.

2. A declaration and judgment pursuant to 28 U.S.C. § 2201 that enforcement of the Rate Regulation will deprive the Associations' members of their rights under the Constitution, in violation of 42 U.S.C. § 1983.

3. Preliminary and permanent injunctive relief preventing Defendant from enforcing or giving effect to the Rate Regulation.

4. An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

5. Such further relief as the Court deems just and equitable.

| | |
|---|---|
| Dated:  April 30, 2021 | Respectfully submitted, |

/s/      *Jeffrey A. Lamken* (w/permission)
Jeffrey A. Lamken
Rayiner I. Hashem*
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W., Suite 500
Washington, D.C. 20037
(202) 556-2010
jlamken@mololamken.com
rhashem@mololamken.com

*Attorneys for Plaintiff ACA Connects –
America's Communications Association*

/s/      *Jared Marx* (w/permission)
Jared Marx
Michael Nilsson*
Harris, Wiltshire & Grannis LLP
1919 M Street, N.W.
The Eighth Floor
Washington, D.C. 20036
(202) 494-4174
jmarx@hwglaw.com
mnilsson@hwglaw.com

*Attorneys for Plaintiff Satellite Broadcasting &
Communications Association*

* *Pro hac vice* motion to be filed

/s/      *Andrew E. Goldsmith*
Scott H. Angstreich*
Joseph S. Hall*
Andrew E. Goldsmith
KELLOGG, HANSEN, TODD, FIGEL &
   FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
jhall@kellogghansen.com
agoldsmith@kellogghansen.com

*Attorneys for Plaintiffs New York State
Telecommunications Association, Inc.,
CTIA – The Wireless Association,
USTelecom – The Broadband Association, and
NTCA – The Rural Broadband Association*