## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

NEW YORK STATE
TELECOMMUNICATIONS ASSOCIATION,
INC., CTIA – THE WIRELESS
ASSOCIATION, ACA CONNECTS –
AMERICA'S COMMUNICATIONS
ASSOCIATION, USTELECOM – THE
BROADBAND ASSOCIATION, NTCA – THE
RURAL BROADBAND ASSOCIATION, and
SATELLITE BROADCASTING &
COMMUNICATIONS ASSOCIATION, on
behalf of their respective members,

               Plaintiffs,

      v.

LETITIA A. JAMES, in her official capacity as
Attorney General of New York,

               Defendant.

Case No. 2:21-cv-2389-DRH-AKT

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

STANDARD OF REVIEW ........................................................................................ 6

ARGUMENT ............................................................................................................ 6

I.   Plaintiffs Are Likely To Succeed on the Merits ................................................. 6

    A.   The Rate Regulation Conflicts with Federal Law and Is Preempted ..................... 7

        1.   The Rate Regulation Conflicts with the FCC's 2018 Order ....................... 7

        2.   The Rate Regulation Conflicts with the Communications Act ................ 11

    B.   The Rate Regulation Intrudes into an Exclusively Federal Field and Is Preempted ......................................................................................... 14

II.   The Rate Regulation Will Subject Plaintiffs' Members to Immediate and Irreparable Harm ......................................................................................... 18

III.   The Equities and the Public Interest Favor an Injunction ................................. 21

CONCLUSION ....................................................................................................... 24

EXHIBIT A – Declaration of Jim Baase

EXHIBIT B – Declaration of Matthew Kramer Coakley

EXHIBIT C – Declaration of Glen Faulkner

EXHIBIT D – Declaration of Jennifer Manner

EXHIBIT E – Declaration of Jason Miller

EXHIBIT F – Declaration of Mark T. Webster

EXHIBIT G – NYS Budget Bill S2506-C, Part NN

EXHIBIT H – Oral Ruling Denying Preliminary Injunction Motion, *American Cable Ass'n v. Becerra*, No. 18-cv-2684 (Feb. 23, 2021) (excerpt of transcript)

# TABLE OF AUTHORITIES

## Cases

*American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ..............20

*Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375 (1983) .....................9

*Bank One v. Guttau*, 190 F.3d 844 (8th Cir. 1999) .........................................................................20

*Beaulieu v. Vermont*, 807 F.3d 478 (2d Cir. 2015) .........................................................................19

*Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767 (1947) ...............12, 13

*Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790 (7th Cir. 1999) ...................................13

*California v. FCC*, 39 F.3d 919 (9th Cir. 1994) ......................................................................10, 13

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984) ..................................................10, 12, 15

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) ....................................................................12

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) ....................................................................................................6, 7, 24

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) ................................................................17

*Computer & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) .............................13

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ................................................17

*Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cir. 2010) .........................................................................14

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) .....................................7, 9

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000) ............................................................9

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .......................................................................................7

*Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486 (2d Cir. 1968) .....................................................14, 17

*Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977) ........................................20

*Long Island Lighting Co. v. County of Suffolk*, 628 F. Supp. 654 (E.D.N.Y. 1986) ...................19

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ........................................................15

*MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994)........................................................12

*Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007)......................................13

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005)...............17

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ......................................................18

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019)...............................................9, 10, 11, 16

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020).....................................21

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)....................................6

*New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97 (2d Cir. 2010).................14, 17

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................21

*Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493 (1989) ..........................13

*Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27 (1919)................................15

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978)......................................................................7

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...............................................................6

*State Corp. Comm'n of Kan. v. FCC*, 787 F.2d 1421 (10th Cir. 1986) ......................................15

*Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*,
    474 U.S. 409 (1986)..............................................................................................................13

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012)........................................................20

*United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968)..................................................17

*United States v. New York*, 708 F.2d 92 (2d Cir. 1983)...............................................................19

*USTelecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).........................................................16

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014).................................................................11, 12

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005).....................................................14

*Western Union Tel. Co. v. Boegli*, 251 U.S. 315 (1920).............................................................15

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) .....................................................14

*Williams v. Rosenblatt Sec., Inc.*, 136 F. Supp. 3d 593 (S.D.N.Y. 2015)......................................24

*Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651 (3d Cir. 2003) ...................................................16


**Administrative Decisions and Notices**

Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*,
    33 FCC Rcd 311 (2018), *pet. for review granted in part and denied in part*,
    *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019)................................7, 8, 9, 10, 11, 16

Memorandum Opinion and Order, *AT&T and the Associated Bell System Cos.*
    *Interconnection with Specialized Carriers*, 56 F.C.C.2d 14 (1975), *aff'd*,
    *California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977)...............................................................15

Memorandum Opinion and Order, *NARUC Petition for Clarification or Declaratory*
    *Ruling*, 25 FCC Rcd 5051 (2010) ....................................................................................16

Memorandum Opinion and Order, *Vonage Holdings Corp. Petition for Declaratory*
    *Ruling Concerning an Order of the Minnesota Public Utilities Commission*,
    19 FCC Rcd 22404 (2004), *aff'd*, *Minnesota Pub. Utils. Comm'n v. FCC*,
    483 F.3d 570 (8th Cir. 2007) ............................................................................................15

Memorandum Opinion and Order on Reconsideration, *Amendment of Sections 64.702*
    *of the Commission's Rules and Regulations (Third Computer Inquiry)*,
    2 FCC Rcd 3035 (1987)....................................................................................................13

Report and Order, *Emergency Broadband Benefit Program*, 36 FCC Rcd 113 (2021) ...............22

[Draft] Report and Order, *Establishing Emergency Connectivity Fund To Close the*
    *Homework Gap*, WC Docket No. 21-92, FCC-CIRC21-93-043021 (Apr. 30,
    2021), https://bit.ly/2RhiSyS. .........................................................................................23

Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and*
    *Promoting the Open Internet*, 30 FCC Rcd 5601 (2015)...............................................9, 10

Third Report and Order, Further Report and Order, and Order on Reconsideration,
    *Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd 3962 (2016) ..................22


**Statutes and Legislation**

Accessible, Affordable Internet for All Act, H.R. 1783, 117th Cong. (2021)..............................22

Accessible, Affordable Internet for All Act, S.745, 117th Cong. (2021).....................................22

American Rescue Plan Act of 2021, H.R. 1319, 117th Cong (2021) ...........................................23

Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ............1, 2, 7, 8, 11, 12, 13, 14, 15, 16, 17

    Title I, 47 U.S.C. § 151 *et seq.* .......................................................................................1

        47 U.S.C. § 152 .......................................................................................................15

        47 U.S.C. § 152(a) .......................................................................................15, 16, 17

        47 U.S.C. § 152(b) ...................................................................................................15

        47 U.S.C. § 153(51) .................................................................................................14

NYS Budget Bill S2506-C, Part NN, § 1 (codified at New York Gen. Bus. Law
    § 399-zzzzz) ..........................................................................................4, 5, 6, 9, 16, 18, 20

## Other Materials

Altice Advantage Internet, *Optimum and Suddenlink Are Committed To Keeping
    Students and Educators in Our Communities Connected*,
    https://www.alticeadvantageinternet.com .......................................................................21

FCC, Emergency Broadband Benefit Providers, https://www.fcc.gov/emergency-
    broadband-benefit-providers#New%20York ..................................................................22

FCC, Wireline Competition Bureau Announces Emergency Broadband Benefit Program
    Launch Date, DA 21-493 (Apr. 29, 2021), https://bit.ly/32ZRbgG ................................22

Find Affordable Internet Options in New York State, https://on.ny.gov/3gSGcxJ ..................1, 22

Lifeline National Verifier, https://nationalverifier.servicenowservices.com/lifeline ...................20

Low Income Broadband Service Exemption Filings, https://on.ny.gov/3f1z0gb ...........................5

Press Release, Governor Cuomo Signs Legislation Establishing First-in-the-Nation
    Program to Provide Affordable Internet to Low-Income Families (Apr. 16,
    2021), https://on.ny.gov/2QZqDtl ...................................................................................4

Press Release, USDA, *USDA Issues Pandemic Flexibilities for Schools and Day Care
    Facilities through June 2022 to Support Safe Reopening and Healthy, Nutritious
    Meals*, https://bit.ly/3haPBAL ......................................................................................4

Spectrum, *Spectrum Internet Assist*, https://www.spectrum.com/internet/spectrum-
   internet-assist ..................................................................................................................21

Transcript of April 7, 2021 Press Conference, https://on.ny.gov/3vN6buI .............................5, 18

U.S. Census Bureau QuickFacts: New York, https://www.census.gov/quickfacts/NY ..................4

**INTRODUCTION**

Under federal law, broadband Internet access service ("broadband") is an interstate information service that is currently subject to a federal regulatory framework, under which a combination of mandatory disclosures, competition, and federal and state enforcement of preexisting laws benefits consumers.  The Federal Communications Commission ("FCC") has consistently — both in 2015 when it regulated broadband as a common-carrier service and in 2018 when it re-established the current, non-common-carrier federal framework — rejected *ex ante* rate regulation for broadband.  Indeed, the broadband service that New York seeks to regulate has *never* been subject to rate regulation at the federal or state level.

New York now seeks to be the first to regulate broadband rates.  A provision of the New York State Fiscal Year 2022 Budget requires wireline, fixed wireless, and satellite broadband providers — by June 15, 2021 — to begin offering to qualifying low-income households high-speed broadband service at a cost to consumers of $15 per month or higher-speed broadband service at a cost to consumers of $20 per month (the "Rate Regulation").  Plaintiffs are trade associations whose members provide wireline, fixed wireless, and satellite broadband service to customers in New York and would be subject to the Rate Regulation.  Plaintiffs' members have created lower-priced broadband offerings specifically designed for low-income consumers and also participate in federal programs — including the recently created federal Emergency Broadband Benefit — that provide subsidies to make broadband more affordable.  As a result, and as New York recognizes, even without the Rate Regulation, there are already "multiple options" for New Yorkers to purchase "affordable internet plans."[1]

---

[1] Find Affordable Internet Options in New York State, https://on.ny.gov/3gSGcxJ.

New York's attempt to regulate the amounts broadband providers collect from their customers is inconsistent with both the FCC's most recent order governing broadband and the federal Communications Act.  Consistent with well-established precedent, the Rate Regulation is preempted under both conflict and field preemption doctrines, and so is invalid under the Constitution's Supremacy Clause.  The Court should declare the Rate Regulation preempted and should preliminarily enjoin Defendant from enforcing or giving effect to it.

First, New York's Rate Regulation conflicts with the FCC's 2018 decision, which the D.C. Circuit upheld in relevant part, that broadband is an interstate information service that should be subject to a light-touch regulatory framework.  The FCC reached that decision in part based on its view that common-carrier regulation, including *ex ante* rate regulation, would be affirmatively harmful both to the continued development and deployment of broadband services and to consumers.  Even when the FCC in 2015 concluded that broadband is instead an interstate telecommunications service that is subject to common-carrier regulation, the FCC still found that broadband should not be subject to any *ex ante* rate regulation.

Second, the Rate Regulation conflicts with the Communications Act, which contains Congress's judgment that interstate information services should not be subject to common-carrier regulation.  Broadband is an interstate information service under federal law, yet the Rate Regulation compels providers to offer broadband on a common-carrier basis:  at state-set rates and terms to all eligible members of the public.  The Rate Regulation is thus an obstacle to achieving Congress's purposes.

Third, New York's Rate Regulation intrudes into an exclusively federal field.  More than a century ago, Congress occupied the field of interstate communications services — a category that includes broadband — and precluded states from directly regulating any interstate

communications service.  In violation of that long-standing law, the Rate Regulation expressly seeks to use state law to set the rates and speed of an interstate communications service.  No state has ever successfully engaged in such regulation.

As the declarations filed with this motion demonstrate, Plaintiffs' members would be irreparably harmed if subjected to New York's unconstitutional Rate Regulation during the pendency of this litigation.  Members would likely be forced to forgo investments in new broadband deployment.  In addition, members would likely suffer extensive monetary losses that would cause additional harms to them and that also could not later be recouped from either New York or their customers.  And if millions of New Yorkers take advantage of the Rate Regulation while this litigation is ongoing, Plaintiffs' members will likely suffer significant losses in customer goodwill when they prevail at the end of the litigation and broadband costs return to their present level.

Finally, the balance of the equities and the public interest favor injunctive relief. Providers offer broadband services specifically for low-income customers, and both long-standing and newly created federal programs directly subsidize the purchase of broadband service by low-income households.  A preliminary injunction would preserve that status quo, under which New York itself recognizes that New Yorkers have "multiple options" to purchase "affordable internet plans."  The public interest is also furthered by enforcing the Supremacy Clause and preventing the implementation of preempted state laws.  The harms to the Associations' members in the absence of an injunction, by contrast, are substantial and urgent.

## BACKGROUND

On April 16, 2021, New York Governor Andrew Cuomo signed NYS Budget Bill S2506-C.  Section 1 of Part NN of that Bill enacts a new section of New York's General Business Law. This new section requires providers of broadband service within 60 days — that is, by June 15,

2021 — to offer one of two high-speed broadband services to qualifying low-income households:  (1) a service that provides Internet access with a download speed of at least 25 Mbps at a cost to consumers of no more than $15 per month, including any recurring taxes and fees; or (2) a service that provides Internet access with a download speed of at least 200 Mbps at a cost to consumers of no more than $20 per month, including any recurring taxes and fees.  *See id.* (new § 399-zzzzz, ¶¶ 2-4) (Ex. G).[2]  The Rate Regulation also limits broadband providers' ability to increase the amounts they charge customers.  *See id.* (new § 399-zzzzz, ¶¶ 3-4).  New York estimates that 2.7 million households — more than 35% of households in the state — will qualify for discounted broadband service under the Rate Regulation.[3]

The statute defines the "broadband service" it regulates as "a mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service provided by a wireline, fixed wireless or satellite service provider," but not including dial-up service.  *Id.* (new § 399-zzzzz, ¶ 1).  The Rate Regulation governs every provider of wireline, fixed wireless, or satellite broadband service, except that the New

---

[2] The New York Public Service Commission is authorized to adopt exceptions "where such download speed is not reasonably practicable."  NYS Budget Bill S2506-C, Part NN, § 1 (new § 399-zzzzz, ¶ 2).  The Commission has not yet announced whether or how it will do so.

[3] *See* Press Release, Governor Cuomo Signs Legislation Establishing First-in-the-Nation Program to Provide Affordable Internet to Low-Income Families (Apr. 16, 2021), https://on.ny.gov/2QZqDtl; U.S. Census Bureau QuickFacts: New York, https://www.census. gov/quickfacts/NY (7.3 million households in New York as of July 1, 2019).  The Department of Agriculture recently announced that *all* households with students are eligible for free and reduced price lunches throughout the 2021-22 school year.  *See* Press Release, USDA, *USDA Issues Pandemic Flexibilities for Schools and Day Care Facilities through June 2022 to Support Safe Reopening and Healthy, Nutritious Meals* (Apr. 20, 2021), https://bit.ly/3haPBAL.  It is unclear whether the additional households temporarily eligible under this federal program will also be eligible under the Rate Regulation.

York Public Service Commission may exempt providers that serve fewer than 20,000 households if it determines that compliance with the Rate Regulation would result in an unreasonable or unsustainable financial impact. *See id.* (new § 399-zzzzz, ¶ 5).[4]

Providers must also allow low-income subscribers to purchase broadband service on a standalone basis, separate from any telephone or television service. *See id.* (new § 399-zzzzz, ¶ 3). And, other than the cost and speed the Rate Regulation mandates, providers must offer the regulated service using the same terms and conditions they apply to their unregulated broadband offerings. *See id.* (new § 399-zzzzz, ¶ 6). Broadband providers must also make all commercially reasonable efforts to advertise the availability of broadband service for low-income consumers at the rates the Rate Regulation imposes. *See id.* (new § 399-zzzzz, ¶ 7).

Governor Cuomo has announced the State's intent to vigorously enforce the Rate Regulation, issuing the following warning to broadband providers:

> And to these internet companies, I say again, you don't operate in the State of New York by an act of God. You operate in the State of New York by the will of the people. If you do not [comply with the Rate Regulation], you will lose your franchise in the State of New York and that's a promise.[5]

The Rate Regulation gives the Attorney General explicit authority to enforce it. *See id.* (new § 399-zzzzz, ¶ 10) ("Whenever there shall be a violation of this section, an application may be made by the attorney general in the name of the people of the state of New York to a court or justice having jurisdiction by a special proceeding to issue an injunction . . . to enjoin and

---

[4] On April 26, 2021, the New York Department of Public Service's staff issued a one-page guidance document listing certain information that providers must include in any requests for such exemptions. *See* Low Income Broadband Service Exemption Filings, https://on.ny.gov/3f1z0gb. The guidance document, however, does not state what standards the New York Public Service Commission will apply in evaluating those applications.

[5] Tr. of April 7, 2021 Press Conference, https://on.ny.gov/3vN6buI.

restrain the continuance of such violation . . . .").  Courts may impose a $1,000 civil penalty for any violation.  *See id.*

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).  "A showing that irreparable harm is probable in the absence of a preliminary injunction is the single most important prerequisite for the issuance of a preliminary injunction."  *Saget v. Trump*, 375 F. Supp. 3d 280, 339 (E.D.N.Y. 2019).

A party may obtain a preliminary injunction upon showing "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *Id.*

## ARGUMENT

## I.    Plaintiffs Are Likely To Succeed on the Merits

Plaintiffs have a strong likelihood of success on their claim that federal law preempts New York's Rate Regulation under both conflict preemption and field preemption doctrines.

The Rate Regulation conflicts with the FCC's 2018 Order[6] concluding that common-carrier regulation of broadband is contrary to the public interest and also with the Communications Act's prohibition against subjecting interstate information services to common-carrier regulation. The Rate Regulation also impermissibly regulates in a field occupied by the federal government through the Communications Act.  At a minimum, these constitutional deficiencies present "sufficiently serious questions going to the merits to make them a fair ground for litigation," such that the Associations are entitled to a preliminary injunction based on their showing of irreparable harm and that the "balance of hardships tipping decidedly" in their favor.  *Citigroup*, 598 F.3d at 35.

A.      **The Rate Regulation Conflicts with Federal Law and Is Preempted**

Under the Supremacy Clause, a state law is conflict-preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  The Rate Regulation stands as an obstacle to effectuating the FCC's determination that broadband should be subject to a non-common-carrier regulatory approach, as well as to Congress's determination that interstate information services should not be subject to common-carrier regulation.

1.      *The Rate Regulation Conflicts with the FCC's 2018 Order*

"Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Likewise, a federal regulator's decision to reduce or eliminate regulation on policy grounds preempts contrary state regulatory efforts to the same degree as a federal decision to expand regulation.  *See*, *e.g.*, *Ray v. Atlantic*

---

[6] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("2018 Order"), *pet. for review granted in part and denied in part*, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam).

*Richfield Co.*, 435 U.S. 151, 178 (1978) ("[W]here failure of federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute, States are not permitted to use their police power to enact such a regulation.") (cleaned up); *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) ("[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.").

The Communications Act regulates interstate communications services, which are divided principally into two categories: information services and telecommunications services. Information services are governed by Title I of the Act and are exempt from common-carrier obligations, while telecommunications services are governed by Title II and are treated as common-carrier services. In the 2018 Order, the FCC exercised its statutory authority to restore the longstanding classification of broadband as an information service under the Communications Act. In doing so, the FCC overturned its own 2015 classification of broadband as a telecommunications service. The 2018 Order therefore ended the temporary imposition of common-carrier regulation on broadband services.

The FCC explained that this reclassification was driven in large measure by its policy view that insulating broadband from common-carrier regulation "is more likely to encourage broadband investment and innovation, furthering [the agency's] goal of making broadband available to all Americans and benefitting the entire Internet ecosystem." 2018 Order ¶ 86. The FCC concluded further that the common-carrier regime it had adopted in 2015 "ha[d] resulted . . . in considerable social cost, in terms of foregone investment and innovation," while having "no discernable incremental benefit." *Id*. ¶ 87. The D.C. Circuit upheld these policy-based

grounds for the FCC's reclassification against challenges by New York, among others.  *See Mozilla Corp. v. FCC*, 940 F.3d 1, 49-55 (D.C. Cir. 2019) (per curiam).  The policies underlying the 2018 Order, as well as the order itself, form a valid predicate for conflict preemption.  *See*, *e.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 874-75, 878 (2000) (state law preempted because it raised an obstacle to achieving the agency's judgment as to the optimal mix of regulatory measures).

The Rate Regulation poses an unmistakable "obstacle to the accomplishment and execution of the full purposes and objectives" underlying the FCC's reclassification of broadband as an information service.  *Fidelity Fed. Sav. & Loan*, 458 U.S. at 153.  The Rate Regulation specifically defines the "broadband service" it would regulate using the same definition the FCC has historically used:  "a mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints."  *Compare* NYS Budget Bill S2506-C, Part NN, § 1 (new § 399-zzzzz, ¶ 1), *with* 2018 Order ¶ 21 ("continu[ing] to define" broadband as "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints") (footnote omitted); 2015 Order[7] ¶ 25 (same).

The 2018 Order specifically identified "rate regulation" as an example of harmful and "costly regulation" that should not be applied to broadband, so defined.  *See* 2018 Order ¶ 101.  Moreover, even in 2015, when the FCC had deemed it appropriate as a policy matter to regulate broadband as an interstate telecommunications service, the FCC explicitly rejected *ex ante* rate regulation for broadband.  The FCC stated that "there will be no rate regulation" of broadband

---

[7] Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("2015 Order").

and that it "cannot envision adopting new *ex ante* rate regulation of broadband . . . in the future." 2015 Order ¶¶ 382, 451. The Rate Regulation thus directly undermines the FCC's consistent policy judgment regarding the appropriate regulatory framework for broadband. *See*, *e.g.*, *California v. FCC*, 39 F.3d 919, 933 (9th Cir. 1994) (finding preemption where "state rules . . . would negate the FCC's goal of allowing [providers] to develop efficiently a mass market for enhanced services for small customers").

The D.C. Circuit held that the FCC's decision that broadband should be protected against rate and other common-carrier regulation through statutory classification as an information service was within the FCC's statutory authority. *See Mozilla*, 940 F.3d at 35 (holding that the FCC had "permissibly classified broadband Internet access as an 'information service'"). That exercise of statutory authority has conflict-preemptive effect, as the D.C. Circuit itself recognized. *See id.* at 85.[8] New York's decision to subject broadband to *ex ante* rate regulation directly conflicts with the FCC's regulatory choice and is therefore preempted. *See*, *e.g.*, *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 708 (1984) (state law preempted where it created "a result [that] is wholly at odds with the regulatory goals contemplated by the FCC").[9]

---

[8] The D.C. Circuit vacated the FCC's sweeping, categorical determination — which went "far beyond conflict preemption" — that the 2018 Order preempted *all* state and local broadband requirements. *See Mozilla*, 940 F.3d at 74-86. The D.C. Circuit noted that conflict preemption must be assessed on a case-by-case basis, *see id.* at 81-82, and expressly rejected the argument that its vacatur of the FCC's categorical preemption "le[ft] no room for implied [*e.g.*, conflict] preemption" in a future, specific case, *id.* at 85. The court stressed that, where "a state practice actually undermines the 2018 Order, then [the FCC] can invoke conflict preemption." *Id.*

[9] While a California federal district court found that the 2018 Order lacked preemptive effect in denying a preliminary injunction motion, that case involved a state effort to impose "net neutrality" rules, not a state effort to regulate broadband prices and speeds. The district court also erred in concluding that the 2018 Order was "a decision by the FCC that it lacked authority to regulate in the first place" and so the 2018 Order therefore could not have conflict-preemptive effect. Hr'g Tr. 65:21-23, *ACA Connects v. Becerra*, No. 18-CV-2684 (E.D. Cal. Feb. 23, 2021) (Ex. H). That statement squarely contradicts *Mozilla*'s finding that "conflict preemption" *would*

2. *The Rate Regulation Conflicts with the Communications Act*

The Communications Act separates interstate communications services into distinct categories, authorizing common-carrier regulation of some (including "telecommunications services"), while prohibiting the imposition of common-carrier requirements on others (including "information services"). Telecommunications and information services are "mutually exclusive" categories, subject to mutually exclusive regulatory regimes. *See* 2018 Order ¶¶ 53, 62 & n.239; *Mozilla*, 940 F.3d at 18-19. Congress's limitation of common-carrier regulation to interstate telecommunications services is contained in 47 U.S.C. § 153(51): "A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services." The D.C. Circuit has held that this provision is a "statutory prohibition[] on common carrier treatment" of information services. *Verizon v. FCC*, 740 F.3d 623, 650 (D.C. Cir. 2014).

As described above, the FCC's 2018 Order returned broadband to its longstanding classification as an interstate information service, and the D.C. Circuit upheld this reclassification. *See* 2018 Order ¶¶ 2, 18, 65; *see Mozilla*, 940 F.3d at 18-35, 49-55. The FCC's determination that broadband is an "information service" — *not* a common-carrier "telecommunications service" — expressly bars the FCC from imposing common-carrier obligations on broadband. *See*, *e.g.*, *Verizon*, 740 F.3d at 650 (holding that, because broadband is an information service, it is "obvious that the Commission would violate the Communications Act were it to regulate broadband providers as common carriers"). That same statutory provision

_____

apply to "a state practice [that] actually undermines the 2018 Order." 940 F.3d at 85. The district court's decision is on appeal; briefing is scheduled to be completed on May 25, 2021. *See ACA Connects v. Bonta*, No. 21-15430 (9th Cir.).

implicitly preempts states from subjecting those same interstate information services to common-carrier regulations.

Yet the Rate Regulation subjects the same broadband service that the Communications Act says should not be subject to common-carrier obligations to a form of *per se* common-carrier regulation:  rate regulation.  Indeed, rate regulation is a quintessential feature of common-carrier regulation and is "utterly central" to the common-carrier provisions of the Communications Act. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 230-32 (1994).  Moreover, "the basic characteristic" of common carriage is the "requirement of holding oneself out to serve the public indiscriminately," while leaving no "room for individualized bargaining." *Verizon*, 740 F.3d at 651-52; *see also Cellco P'ship v. FCC*, 700 F.3d 534, 547 (D.C. Cir. 2012) ("If a carrier is forced to offer service indiscriminately and on general terms, then that carrier is being relegated to common carrier status.").  The Rate Regulation has just that effect, requiring broadband providers to make their services available to a statutorily defined segment of the general public at prices set by statute and on uniform terms and conditions.  New York's law therefore squarely conflicts with Congress's decision to immunize interstate information services like broadband from such regulation.

The Supreme Court has made clear that "when federal officials determine . . . that restrictive regulation of a particular area is not in the public interest" — as Congress did here — "States are not permitted to use their police power to enact such a regulation." *Capital Cities*, 467 U.S. at 708.  For example, in *Bethlehem Steel Co. v. New York State Labor Relations Board*, 330 U.S. 767 (1947), the Court confronted a state law effort to allow unionization of foremen during a time when a federal agency had ruled that federal labor law did not provide such a right. *See id.* at 770.  The Court held the state's action preempted, concluding that states cannot

exercise their police power "where failure of the federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute." *Id.* at 774; *see also Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*, 474 U.S. 409, 422-23 (1986) (holding that Congress's decision to exempt certain gas sales from FERC public-utility regulation preempted states from reimposing such regulation on those same sales).[10]

That principle applies here.  For decades, the FCC and the courts have recognized that subjecting information service providers to common-carrier regulation at the state level would contravene federal law.  *See*, *e.g.*, Memorandum Opinion and Order on Reconsideration, *Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 2 FCC Rcd 3035, ¶ 181 n.374 (1987) (holding that "[s]tate public utility regulation" (*i.e.*, common-carrier regulation) "of entry and service terms and conditions" of "enhanced" services (which were the predecessor to information services) would hamper federal attempts to "promot[e] competition and open entry"); *Computer & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) (rejecting challenge to FCC preemption of state imposition of common-carrier regulation on providers of enhanced services); *California v. FCC*, 39 F.3d at 931-33 (same).

---

[10] *See also Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 507 n.8 (1989) ("Congress' intent . . . that the supply, the demand, and the price of deregulated gas be determined by market forces requires that the States still may not regulate purchasers so as to affect their cost structures."); *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007) (holding that the federal regulatory decision not to subject Voice over Internet Protocol service to common-carrier regulation preempted state-law common-carrier requirements); *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 802 (7th Cir. 1999) (holding that agency deregulation preempts state law when the agency "considered the issue and affirmatively decided not to regulate").

The Rate Regulation's attempt to treat broadband — an information service — as a common-carrier service conflicts with Congress's judgment in the Communications Act and is therefore preempted.[11]

### B.     The Rate Regulation Intrudes into an Exclusively Federal Field and Is Preempted

Under the Supremacy Clause, a state law is field-preempted where "federal law occupies an entire field of regulation and leaves no room for state law." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005)).  The Rate Regulation is preempted under this doctrine because it purports by its terms to regulate an interstate communications service, a field that Congress has occupied for more than a century.

As the Second Circuit has recognized, the Supreme Court has held that federal law governing interstate communications services "indicates an intent on the part of Congress to occupy the field to the exclusion of state law." *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968).  The Second Circuit explained that the Supreme Court, in pre-Communications Act cases, found that "Congress had occupied the field to the exclusion of state action." *Id.* at

---

[11] The California district court erred in concluding that the Communications Act does not impliedly preempt state common-carrier regulation of interstate information services.  *See* Hr'g Tr. 63:24-65:7.  That court conflated express and implied preemption — the "lack of a[] . . . provision" in the Communications Act expressly preempting states from regulating interstate information services as common-carrier services does not "mean Congress intended to preserve conflicting state law." *Farina v. Nokia Inc.*, 625 F.3d 97, 130 (3d Cir. 2010).  In 47 U.S.C. § 153(51), Congress codified decades of FCC decisions exempting information services providers from common-carrier regulation under the Communications Act.  That statutory language cannot plausibly be read, as the district court did, to reflect Congress's willingness to allow each of the 50 states to decide whether and how to regulate interstate information service providers as common carriers — a power they had never before had.  *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.").

491-92 (discussing *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27 (1919), and *Western Union Tel. Co. v. Boegli*, 251 U.S. 315 (1920)).  Because the Communications Act was "intended to achieve the same objectives," those prior decisions "retain their importance for purposes of determining the scope of the Communications Act."  *Id.* at 490-91.

Indeed, the Communications Act grants the FCC "comprehensive authority" to "regulate all aspects of interstate communication by wire or radio."  *Capital Cities*, 467 U.S. at 700. Congress's intent to occupy this field is expressed in § 152 of the Communications Act. Subsection (a) of that provision states that the Act "appl[ies] to all interstate . . . communication by wire or radio," 47 U.S.C. § 152(a), while subsection (b) denies the FCC "jurisdiction with respect to . . . intrastate communication service by wire or radio," *id.* § 152(b).  Section 152 thus "divide[d] the world . . . into two hemispheres — one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction."  *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986).[12]  In light of this division of authority, "interstate communications service[s]

---

[12] *See also State Corp. Comm'n of Kan. v. FCC*, 787 F.2d 1421, 1427 (10th Cir. 1986) (finding that § 152 "has been uniformly interpreted" as giving the FCC jurisdiction over all communications except "local matters" that by "their nature and effect are separable from and do not substantially affect the regulation of interstate communications"); Memorandum Opinion and Order, *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, 19 FCC Rcd 22404, ¶ 16 (2004) (finding that FCC has "exclusive jurisdiction over 'all interstate and foreign communication'") (quoting 47 U.S.C. § 152(a)), *aff'd*, *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007); Memorandum Opinion and Order, *AT&T and the Associated Bell System Cos. Interconnection with Specialized Carriers*, 56 F.C.C.2d 14, ¶ 21 (1975) ("the States do not have jurisdiction over interstate communications"), *aff'd*, *California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977) (per curiam).

are to be governed solely by federal law" because "Congress intended to occupy the field." *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003).[13]

It is beyond dispute that the Rate Regulation applies to interstate communications services. As shown above, the Rate Regulation, like the FCC, specifically defines the "broadband service" at issue as "a mass-market retail service that provides the capability to transmit data to and receive data from *all or substantially all internet endpoints*." NYS Budget Bill S2506-C, Part NN, § 1 (new § 399-zzzzz, ¶ 1) (emphasis added); *accord* 2018 Order ¶ 21. Moreover, independent of its classification as an information service or a telecommunications service, the FCC has consistently held — and courts have affirmed — that broadband is an *interstate* communications service. That consistent finding is based on the applicable "end-to-end jurisdictional analysis," which considers the location of the end points of a communication rather than where the customer receiving the service is located. *See, e.g.*, 2018 Order ¶ 199 (citing precedent); *USTelecom Ass'n v. FCC*, 825 F.3d 674, 730 (D.C. Cir. 2016) (same); Memorandum Opinion and Order, *NARUC Petition for Clarification or Declaratory Ruling*, 25 FCC Rcd 5051, ¶ 8 n.24 (2010) (broadband is "properly considered jurisdictionally interstate for regulatory purposes"). Because the Rate Regulation reaches providers of services connecting "all internet end points," including the multitude that are outside New York, those services are interstate, even though a customer can of course be located in only one state at a time.

---

[13] When the FCC adopted its broad preemption directive in the 2018 Order, it did so because of concerns that states might attempt "to regulate the use of a broadband Internet connection for *intrastate communications*" and thereby make it infeasible for the FCC to "maintain[] uniform federal rules for interstate communications." 2018 Order ¶ 200 n.744. As noted above, the D.C. Circuit vacated that determination, but only because it found that the FCC had insufficiently justified its "categorical determination that any and all forms of state regulation of *intrastate* broadband would inevitably conflict with the 2018 Order." *Mozilla*, 940 F.3d at 82 (emphasis added). Nothing in the 2018 Order or *Mozilla* suggests that the Communications Act allows states to regulate *interstate* broadband service.

Because broadband service "qualifies as 'interstate and foreign communication by wire' within the meaning of Title I of the Communications Act," *Comcast Corp. v. FCC*, 600 F.3d 642, 646-47 (D.C. Cir. 2010) (quoting 47 U.S.C. § 152(a)), it is subject to the "centraliz[ed] authority" of the FCC, 47 U.S.C. § 151, and New York lacks the authority to regulate it.  Yet the Rate Regulation by its own terms purports to regulate directly an interstate communications service — and to regulate core terms of that service, including its price and speed.  No state has ever successfully engaged in such regulation of any interstate communications service.

The Communications Act gives the FCC jurisdiction over "all interstate and foreign communication by wire or radio," 47 U.S.C. § 152(a), and reflects Congress's decision to "occupy th[at] field," *Ivy Broad. Co.*, 391 F.2d at 490.  Because the Rate Regulation expressly seeks to regulate within that field, it intrudes on an area that Congress intended federal law to occupy and is therefore preempted.  *See New York SMSA*, 612 F.3d at 105.[14]

---

[14] The California district court reached the opposite conclusion, but again erred in finding that the absence of express preemptive language meant there is no implied field preemption.  *See* Hr'g Tr. 63:11-17.  "Even without an express provision for preemption, . . . state law must yield to a congressional Act . . . [w]hen Congress intends federal law to occupy the field."  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).  The district court also erred in asserting that the Communications Act "specifically left out certain types of interstate communications from the FCC's jurisdiction, like information services."  Hr'g Tr. 63:18-23.  The Supreme Court has held that the FCC has authority under the Communications Act to regulate interstate information services such as broadband "under its Title I ancillary jurisdiction."  *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 996 (2005).  And, more generally, the Supreme Court has held that the FCC's authority under the Communications Act is not limited to "those activities . . . specifically described by the Act's other provisions," like the common-carrier provisions in Title II.  *United States v. Southwestern Cable Co.*, 392 U.S. 157, 172 (1968).

## II.     The Rate Regulation Will Subject Plaintiffs' Members to Immediate and Irreparable Harm

The Associations' members face immediate and irreparable harm from the Rate Regulation.  Once the Rate Regulation goes into effect, the Associations' members will face a "Hobson's choice" between "continually violat[ing]" the Rate Regulation and "expos[ing] themselves to potentially huge liability; or . . . suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  On one side of that choice, any members that fail to comply with the Rate Regulation face civil penalties[15] and Governor Cuomo's "promise" that violators will "lose [their] franchise in the State of New York," leaving them unable to provide service to any customers.[16]  On the other side of the "Hobson's choice," the Associations' members may opt to incur the harms that would result from "obeying the law during the pendency of the proceedings and any further review." *Morales*, 504 U.S. at 381.  As the members' declarations attest, these harms are manifold and significant.

*First*, the Rate Regulation will likely force members to cancel preexisting plans to expand their broadband networks.  Empire Telephone Corporation ("Empire") explains that, even though it has qualified to receive an $11.3 million grant from the U.S. Department of Agriculture to expand service to unserved and underserved households in Livingston County, it will likely turn down the grant and cancel the project, which would have built more than 330 miles of fiber optic network capable of serving nearly 1,100 homes.  *See* Declaration of Jim Baase ¶ 6 (Ex. A).  Empire also would likely cut back on an existing investment in fiber optic facilities to build out its network in and around the city of Binghamton.  *See id.* ¶ 7.  In both cases, the high percentage

---

[15] *See* NYS Budget Bill S2506-C, Part NN, § 1 (new § 399-zzzzz, ¶ 10).

[16] Tr. of April 7, 2021 Press Conference, https://on.ny.gov/3vN6buI.

of customers in Empire's territory who are eligible for discounted service under the Rate Regulation would make these investments prohibitively costly. *See id.* ¶¶ 5-7. Similarly, MTC Cable will have to halt planned service expansions to bring broadband to currently unserved customers. *See* Declaration of Glen Faulkner ¶ 19 (Ex. C). The elimination of these planned investments would cause irreparable harm to these businesses and cost them goodwill from customers they otherwise could and would have served. *See*, *e.g.*, *Long Island Lighting Co. v. County of Suffolk*, 628 F. Supp. 654, 661 (E.D.N.Y. 1986) ("It is well settled that an act threatening the destruction of an on-going business concern constitutes irreparable harm.").

*Second*, the Rate Regulation would substantially reduce members' revenues from providing broadband service and in many cases require them to provide service at rates below their costs. *See* Baase Decl. ¶¶ 8-9; Declaration of Matthew Kramer Coakley ¶¶ 9, 14, 17 (Ex. B); Faulkner Decl. ¶¶ 15-17; Declaration of Jennifer Manner ¶¶ 5-6 (Ex. D); Declaration of Jason Miller ¶¶ 2, 7, 9 (Ex. E); Declaration of Mark T. Webster ¶¶ 6-8 (Ex. F). These monetary harms would be unrecoverable in *ex post* damages from the State as a result of its Eleventh Amendment immunity and, therefore, constitute irreparable harm.[17] Nor could they be recovered by raising rates on high-income customers, who would likely switch to rival providers. *See* Faulkner Decl. ¶¶ 17, 20. And these monetary losses will likely lead to additional irreparable harms, including an inability to make debt payments on loans obtained in reliance on a New York program that provided state funds to deploy broadband service to low-income households at a monthly price of no more than $60. *See id.* ¶¶ 9, 18; Miller Decl. ¶¶ 4, 8. The inability to

---

[17] *See*, *e.g.*, *Beaulieu v. Vermont*, 807 F.3d 478, 485 (2d Cir. 2015); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming district court's holding that "[plaintiff's] injury was irreparable even though [plaintiff's] losses were only pecuniary because a suit in federal court against New York to recover the damages sustained by [plaintiff] would be barred by the Eleventh Amendment").

make payments on those loans as a result of the Rate Regulation's substantial reduction in the amount customers pay will damage the companies' credit, relationships with lenders, and commercial reputations.  *See* Faulkner Decl. ¶ 21; Miller Decl. ¶ 11.

*Third*, the Rate Regulation will also impose significant, unrecoverable administrative costs on the Associations' members.  Unlike federal programs to subsidize broadband service, for which providers can rely on a National Verifier[18] to determine a customer's eligibility, the Rate Regulation leaves it to each provider to develop a system for validating customers' eligibility.  *See* Coakley Decl. ¶ 8; Manner Decl. ¶ 7; Webster Decl. ¶ 9.  The Rate Regulation also requires providers to spend additional money to advertise the availability of the discounted services to low-income consumers.  *See* NYS Budget Bill S2506–C, Part NN, § 1 (new § 399-zzzzz, ¶ 7).  This, too, would impose substantial costs.  *See* Coakley Decl. ¶ 10; Faulkner Decl. ¶ 19; Manner Decl. ¶ 7; Webster Decl. ¶ 9.

*Fourth*, if the Court allows the Rate Regulation to go into effect but later holds that federal law preempts the Rate Regulation, the withdrawal of the discounts the Rate Regulation requires would undoubtedly prove unpopular with those customers benefitting from them, harming the members' reputations and customer goodwill.  *See* Baase Decl. ¶ 9; Coakley Decl. ¶¶ 13, 18; Faulkner Decl. ¶ 21; Manner Decl. ¶ 8; Miller Decl. ¶ 11; Webster Decl. ¶ 10; *see also Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir. 1977) (affirming finding of irreparable harm because plaintiff "presented ample evidence to show a threatened loss of good will and customers").

---

[18] *See* Lifeline National Verifier, https://nationalverifier.servicenowservices.com/lifeline.

### III.     The Equities and the Public Interest Favor an Injunction

Although a preliminary injunction here is "warranted on the strength of the[] first two factors alone," *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020), the remaining factors — a balance of the equities and the public interest — also support entry of a preliminary injunction.  "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

To begin with, permitting a state to enforce a preempted statute harms the public interest. *See*, *e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives [is] not in the public interest."); *Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999) ("[T]he public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law."); *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059-60 (9th Cir. 2009) (noting, in reversing the denial of a preliminary injunction, "the public interest represented in Congress' decision to deregulate the . . . industry, and the Constitution's declaration that federal law is to be supreme").

In addition, broadband providers, including Plaintiffs' members, already offer lower priced broadband service to low-income customers.[19]  And the federal government is protecting the public interest through programs to aid low-income consumers in obtaining low-cost broadband service through direct subsidies.  New York itself has created an online portal to alert

---

[19] *See*, *e.g.*, Coakley Decl. ¶¶ 4-5; *see also* Altice Advantage Internet, *Optimum and Suddenlink Are Committed To Keeping Students and Educators in Our Communities Connected*, https://www.alticeadvantageinternet.com (30 Mbps speed for $14.99 per month for qualifying customers); Spectrum, *Spectrum Internet Assist*, https://www.spectrum.com/internet/spectrum-internet-assist (same).

New Yorkers to these existing offerings and federal programs, informing New Yorkers that they have "multiple options" to purchase "affordable internet plans."[20]

First, the federal Lifeline program has since 2016 subsidized broadband service for qualifying low-income consumers. *See* Third Report and Order, Further Report and Order, and Order on Reconsideration, *Lifeline and Link Up Reform and Modernization*, 31 FCC Rcd 3962, ¶ 6 (2016). Qualifying customers can receive $9.25 per month toward their purchase of broadband service. *See id.* ¶ 114. Households containing at least one person who participates in the SNAP, Medicaid, SSI, federal public housing assistance, or Veterans Pension benefit programs, or certain Tribal programs, qualify for Lifeline support, as do households with income less than 135% of the federal poverty level. *See id.* ¶ 7. The FCC has created a National Verifier to enable providers to quickly and accurately determine who qualifies for the program. *See id.*

Second, in December 2020, Congress created a $3.2 billion Emergency Broadband Connectivity Fund, which the FCC administers through the Emergency Broadband Benefit. *See* Report and Order, *Emergency Broadband Benefit Program*, 36 FCC Rcd 113, ¶ 1 (2021).[21] On April 29, 2021, the FCC announced that the Emergency Broadband Benefit will go into effect on May 12, 2021.[22] More than 60 broadband providers in New York have already confirmed that they will participate.[23] Qualifying households can receive a subsidy of up to $50 per month (and

---

[20] Find Affordable Internet Options in New York State, https://on.ny.gov/3gSGcxJ.

[21] Bills have recently been introduced in Congress to allocate an additional $6 billion to the Emergency Broadband Connectivity Fund. *See* Accessible, Affordable Internet for All Act, H.R. 1783, 117th Cong. (2021), https://www.congress.gov/bill/117th-congress/house-bill/1783/text; Accessible, Affordable Internet for All Act, S.745, 117th Cong. (2021), https://www.congress.gov/bill/117th-congress/senate-bill/745/text.

[22] *See* FCC, Wireline Competition Bureau Announces Emergency Broadband Benefit Program Launch Date, DA 21-493 (Apr. 29, 2021), https://bit.ly/32ZRbgG.

[23] *See* FCC, Emergency Broadband Benefit Providers, https://www.fcc.gov/emergency-broadband-benefit-providers#New%20York.

up to $75 per month in Tribal areas) from participating providers for their broadband service, as well as a one-time $100 benefit toward a computer or tablet.  *See id.* ¶¶ 4-5.  Participating providers are eligible to receive reimbursement for broadband offerings that were available as of December 1, 2020.  *See id.* ¶ 72.  Qualifying households include those that have at least one member who is eligible for Lifeline or is approved to receive benefits under the free and reduced-price school lunch program, have experienced a substantial loss of income since the start of the COVID-19 pandemic, or have received a federal Pell Grant in 2021.  *See id.* ¶ 43.  And households may receive both the Emergency Broadband Benefit and the Lifeline subsidy.  *See id.*  The FCC has expanded its National Verifier so that providers can quickly and accurately determine who is eligible for the Emergency Broadband Benefit.  *See id.* ¶ 3.

Third, the American Rescue Plan enacted on March 11, 2021 includes a $7.17 billion Emergency Connectivity Fund.[24]  The FCC has until May 10, 2021 to promulgate regulations to implement this additional fund, which is to be used by schools and libraries for the purchase of computer equipment or broadband service, including for use by students or library patrons at home or at other locations outside of schools and libraries.  *See* H.R. 1319, § 7402(a).  On April 30, 2021, the FCC released a draft order, which would adopt rules authorizing schools and libraries to seek reimbursement for their prior expenditures to provide broadband to students, staff, and patrons during the pandemic, as well as to apply for additional funds to meet those individuals' remaining unmet needs.[25]

---

[24] *See* American Rescue Plan Act of 2021, H.R. 1319, § 7402, https://www.congress. gov/bill/117th-congress/house-bill/1319/text.

[25] *See* Draft Report and Order, *Establishing Emergency Connectivity Fund To Close the Homework Gap*, WC Docket No. 21-92, FCC-CIRC21-93-043021, ¶ 4 (Apr. 30, 2021), https://bit.ly/2RhiSyS.

These federal programs will ensure that, at most, minimal hardship will result from a preliminary injunction that would "preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits."  *Williams v. Rosenblatt Sec., Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015).  Therefore, the "balance of hardships tip[s] decidedly toward the party requesting the preliminary relief," such that Plaintiffs are entitled to a preliminary injunction based on our showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation."  *Citigroup Glob. Markets*, 598 F.3d at 35.

## CONCLUSION

The Court should grant Plaintiffs' motion and preliminarily enjoin the Rate Regulation.

Dated: May 6, 2021

Respectfully submitted,

/s/      *Jeffrey A. Lamken* (w/permission)
Jeffrey A. Lamken*
Rayiner I. Hashem*
MOLOLAMKEN LLP
600 New Hampshire Ave. N.W., Suite 500
Washington, D.C. 20037
(202) 556-2010
jlamken@mololamken.com
rhashem@mololamken.com

*Attorneys for Plaintiff ACA Connects –*
*America's Communications Association*


/s/      *Jared Marx* (w/permission)
Jared Marx
Michael Nilsson*
Harris, Wiltshire & Grannis LLP
1919 M Street, N.W.
The Eighth Floor
Washington, D.C., 20036
(202) 494-4174
jmarx@hwglaw.com
mnilsson@hwglaw.com

*Attorneys for Plaintiff Satellite Broadcasting*
*& Communications Association*


*Pro hac vice* motion to be filed

/s/      *Andrew E. Goldsmith*
Scott H. Angstreich*
Joseph S. Hall*
Andrew E. Goldsmith
KELLOGG, HANSEN, TODD,
   FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
sangstreich@kellogghansen.com
jhall@kellogghansen.com
agoldsmith@kellogghansen.com

*Attorneys for Plaintiffs New York State*
*Telecommunications Association, Inc.*
*CTIA – The Wireless Association,*
*USTelecom – The Broadband Association, and*
*NTCA – The Rural Broadband Association*

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 6, 2021, the foregoing document was filed with the Clerk of the Court and served on parties using the U.S. District Court for the Eastern District of New York's Electronic Document Filing System (ECF).  Courtesy copies shall be sent to the Court today.

/s/      *Andrew E. Goldsmith*
Andrew E. Goldsmith