UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NEW YORK STATE TELECOMMUNICATIONS
ASSOCIATION, INC., CTIA – THE WIRELESS
ASSOCIATION, ACA CONNECTS – AMERICA'S
COMMUNICATIONS ASSOCIATION,
USTELECOM – THE BROADBAND ASSOCIATION,
NTCA – THE RURAL BROADBAND ASSOCIATION,
and SATELLITE BROADCASTING &
COMMUNICATIONS ASSOCIATION, on behalf of
their respective members,

**Docket No.: 21 CV 2389
(DRH)(AKT)**

                                  Plaintiffs,


        - against –


LETITIA A. JAMES, in her official capacity as
Attorney General of New York,

                                  Defendant.
-------------------------------------------------------------------X


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION


LETITIA JAMES
Attorney General of the
        State of New York
300 Motor Parkway, Suite 230
Hauppauge, New York   11788
(631) 231-2424


PATRICIA M. HINGERTON
SUSAN M. CONNOLLY
        OF COUNSEL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………..…………………ii

PRELIMINARY STATEMENT……….........................................................................1

BACKGROUND.........................................................................................................2

    A.  The Dual Federal-State Regulatory Framework…………...............................2

    B.  The FCC's 2018 Order ………………………………………………………...4

    C.  The Affordable Broadband Act……………………………………………...5

        1.  The ABA is an Exercise of the State's Police Power to Ensure That All New Yorkers Have High-Speed Internet Access, a Necessity of Modern Life ……………………………………………...........................................5

        2.  The ABA Does Not "Rate Regulate" Broadband Services………………….6

STANDARDS FOR THE ISSUANCE OF PRELIMINARY INJUNCTIVE RELIEF…………..6

ARGUMENT.............................................................................................................7

I.    PLAINTIFFS HAVE NOT DEMONSTRATED IMMINENT IRREPARABLE HARM, AND THE BALANCE OF THE EQUITIES WEIGHS SHARPLY AGAINST A PRELIMINARY INJUNCTION HERE……………………………………7

    A.  Plaintiffs' Asserted Harms are Completely Speculative………………………7

    B.  The Equities Weigh Strongly in the State's Favor …………………………...10

II.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR PREEMPTION CLAIMS………………………………………………12

    A.  Congress Has Not Preempted the Field……………………………………12

    B.  Conflict Preemption Does Not Apply……………………………………...17

        1.  The ABA Does Not Conflict with the Act…………………………………17

            a.  The ABA Is Not a *Per Se* Common Carrier Regulation……………………17

            b.  Section 153(51) Applies Only to the FCC…………………………………19

        2.  The ABA Does Not Conflict with the 2018 Order……………………………...22

CONCLUSION.........................................................................................................25

i

# **TABLE OF AUTHORITIES**

**Cases**

*ACA Connects v. Becerra,* No.18-CV-2684 (E.D. Cal. Feb. 23, 2021)…………………………14

*ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318 (D. Me. 2020)…………24

*Am. Library Ass'n v. F.C.C.*, 406 F.3d 689 (D.C. Cir. 2005)……………………………………..3

*Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983)……………………...24

*A.S.I. Worldwide Commc'ns Corp. v. WorldCom, Inc.*, 115 F. Supp. 2d 201 (D.N.H. 2000)…...16

*AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214 (1998)…………………………………16

*AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*, 349 F.3d 402 (7th Cir. 2003)……………………...21

*Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767 (1947)…………………..20

*Blatchford v. Native Vill. of Noatak*, 501 U.S. 775 (1991)………………………………………20

*Borey v. National Union Fire Ins. Co.*, 934 F.2d 30 (2d Cir. 1991)……………………………10

*California v. FCC*, 39 F.3d 919 (9th Cir. 1994)………………………………………………..19, 25

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984)……………………………………20, 25

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012)………………………………………....18

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992)……………………………………12-13

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30
(2d Cir. 2010)………………………………………………………………………………………...7

*Cohen v. Apple*, 497 F. Supp. 3d 769 (N.D. Cal. 2020)………………………………………21

*Comcast Corp. v. F.C.C.*, 600 F.3d 642 (D.C. Cir. 2010)………………………………………...3

*Computer and Communications Industry Association v. FCC*, 693 F.2d 198
(D.C. Cir. 1982)……………………………………………………………………………………19

*Conn. ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82 (2d Cir. 2000)…………………15

*English v. General Elec. Co.*, 496 U.S. 72 (1990)……………………………………...15, 17

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982)……………………………..23

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000)………………………………………21

*Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017)……………………………………..3, 22

*Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017)………………………20

*Grand River Enter. Six Nations, Ltd. V. Pryor*, 481 F.3d 60 (2d Cir. 2007)…………………...8

*In re NOS Commc'ns, MDL No. 1357*, 495 F.3d 1052 (9th Cir. 2007)…………………………13

*In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188 (10th Cir. 2010)……….13

*Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486 (2d Cir. 1968)……………………………………16

*Johnson v. American Towers, LLC*, 781 F.3d 693 (4th Cir. 2015)………………………………13

*Levcor Int'l v. MCI WorldCom Commc'ns, Inc.*, 2001 WL 716918
(S.D.N.Y. June 26, 2001)………………………………………………………………...16

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)…………………………2, 13, 22-23

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998)…………………………………………...13, 16

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)………………………………………………...12

*Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019)…………………………...24

*Metrophone Telecomms., Inc. v. Global Crossing Teles., Inc.*, 423 F.3d 1056
(9th Cir. 2005)…………………………………………………………………………………15

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985)………………………………2

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019)………………………...2-4, 14-16, 19, 20, 24

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977)……………………………..8

*New York v Nuclear Regulatory Com.*, 550 F2d 745 (2d Cir 1977)…………………………...8

*Nken v. Holder*, 556 U.S. 418 (2009)…………………………………………………………..7

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190
(1983)……………………………………………………………………………………………17

*People ex re. Schneiderman v. Charter Comm'ns, Inc.* 162 A.D.3d 553 (1st Dep't 2018)……...14

*Pinney v. Nokia,* 402 F.3d 430 (4th Cir. 2005)………………………………………………21

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495 (1988)………...25

*Ray v. Atl. Richfield Co.*, 435 U.S. 151 (1978)………………………………………………24

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1998)………………………………………6-9

*Sussman v. Crawford*, 488 F.3d 136 (2d Cir. 2007)………………………………………6

*Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016)………………………………………13-14

*Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*, 474 U.S. 409 (1986)………...20

*USA Recycling v. Town of Babylon*, 66 F.3d 1272 (2d Cir. 1995)………………………………7

*U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674 (D.C. Cir. 2016)……………………………………4

*Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019)………………………………24-25

*Wyeth v. Levine*, 555 U.S. 555 (2009)………………………………………………17

**Statutes, Rules, & Administrative Orders**

47 U.S.C. § 152………………………………………………..............2, 3, 13, 15, 22

47 U.S.C. § 152 note………………………………………………………21

47 U.S.C. § 153………………………………………………………14, 19-21

47 U.S.C. § 154………………………………………………………………3

47 U.S.C. § 160………………………………………………………………20

47 U.S.C. §§ 201-03………………………………………………………20

47 U.S.C. § 253………………………………………………...........2-3, 13-15

47 U.S.C. § 254………………………………………………………………12

47 U.S.C. § 332………………………………………………………14-15

Communications Act of 1934, 47 U.S.C. § 151 *et seq*………………………………………2

Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, § 940 (2020)………………...11

H.R. Rep. No. 104-458 (1996)……………………………………………………………...19

*In the Matters of Amendment of Sections 64.702 of the Comm'n's Rules & Regulations (Third Comput. Inquiry)*, 2 F.C.C. Rcd. 3035 (1987)……………………………………………19

*In the Matter of Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015)……………………………………………………………………………………4, 23

*In the Matter of Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018)…………………..4, 22-23

*NARUC Petition for Clarification or Declaratory Ruling*, 25 FCC Rcd 5051 (2010)…………..14

N.Y. Gen. Bus. Law § 399-zzzzz…………………………………………………...1, 6, 10, 14, 18

Telecommunications Act of 1996  P.L. No. 104-104 (1996), 110 Stat. 56…………………...2, 21

This Memorandum of Law is submitted on behalf of Defendant Letitia James, in her official capacity as the Attorney General of the State of New York, in opposition to Plaintiffs' application for a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiffs—several industry trade associations whose members include companies that provide broadband internet service in New York State (the "State")—challenge the State's recently enacted Affordable Broadband Act, N.Y. Gen. Bus. Law ("GBL") § 399-zzzzz (the "ABA").  In the ABA, the State exercised its police powers to protect its most vulnerable residents by requiring internet service providers to offer a high-speed broadband service plan to qualifying low-income consumers at no more than $15 per month, or a higher-speed broadband service at no more than $20 per month. As the Legislature observed in passing the ABA, internet access is no longer a luxury, but a necessity of modern life. Particularly given the way everyday life has changed because of the COVID-19 pandemic, New Yorkers—like the rest of the world—have become dependent on the internet to work, attend school, access healthcare services, and obtain food and other essential goods or services.

In this action, Plaintiffs argue that broadband internet access service providers are immune from the State's regulatory authority and need not comply with the ABA—despite the fact that they choose to offer goods and services to residents of New York—based on sweeping theories of federal preemption.  But Plaintiffs' arguments overstate the effect of federal statutes and regulations, which expressly preserve rather than displace the States' exercises of their police powers.  Plaintiffs further mischaracterize the ABA as a "rate regulation" that impermissibly encroaches on interstate communications services.  In reality, the ABA is an accessibility requirement that applies to Plaintiffs' pricing practices and that affects only a specifically defined

group of New Yorkers to ensure that they can obtain broadband at affordable prices, thereby providing them with the opportunity to obtain the necessary access that other residents have.

Plaintiffs ask this Court to issue a preliminary injunction blocking enforcement of the statute before June 15, 2021, when they must comply with its provisions. This Court should deny Plaintiffs' request because they have not shown irreparable harm, a balance of the equities in their favor, or any likelihood of success on the merits of their claims.

## BACKGROUND

### A. The Dual Federal-State Regulatory Framework

State governments "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of their residents." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). Congress respected the States' traditional authority in the Federal Communications Act of 1934 (the "Act"), 47 U.S.C. § 151 *et seq*., as amended by the Telecommunications Act of 1996 (the "1996 Act"), *see* P.L. No. 104-104 (1996), 110 Stat. 56, which expressly established "a system of dual state and federal regulation" of communications, *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 359 (1986). While the Act confers substantial regulatory authority on the Federal Communications Commission ("FCC") over "all interstate and foreign communication by wire or radio," 47 U.S.C. § 152(b), Congress expressly preserved the States' plenary authority over all aspects of communications not delegated to the FCC's exclusive jurisdiction. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 80-81 (D.C. Cir. 2019). Among other things, Congress preserved all state remedies available "at common law or by statute," 47 U.S.C. § 253(b), and embraced state authority in areas of traditional state concern—including state-law "requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers," *id.* § 253(b). And Congress

2

explicitly barred the FCC from regulating with respect to "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier"—traditional areas of regulatory authority that thus remained reserved to the States. *See id.* § 152(b). Although the 1996 Act authorized the FCC to regulate with respect to some intrastate matters, "the states still reign supreme over intrastate rates." *Global Tel*Link v. FCC*, 866 F.3d 397, 403 (D.C. Cir. 2017) (quotation marks omitted).

Among its delegated powers, Congress granted the FCC the authority to "classify[] various [communication] services into the appropriate statutory categories" for purposes of FCC regulation under the Act. *Mozilla*, 940 F.3d at 17. For broadband internet access services ("BIAS"), there are "two potential classifications … 'telecommunications services' under Title II of the Act and 'information services' under Title I." *Id*. Whether a service is classified under Title I (information services) or Title II (telecommunications services) determines the scope of the FCC's authority to regulate that service. "Title II entails common carrier status and triggers an array of statutory restrictions and requirements (subject to forbearance at the Commission's election)." *Id.* (citation omitted). Congress also expressly provided for preemption of state laws when Title II applies. *See, e.g.,* 47 U.S.C. § 253(a), (d). By contrast, the FCC's authority to regulate Title I information services is limited to its far more restricted "ancillary authority," *Comcast Corp. v. F.C.C.*, 600 F.3d 642, 645 (D.C. Cir. 2010),[1] and Congress did not provide for similar express preemption.

---

[1] This "ancillary authority" "empowers the Commission to 'perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions,'" *Mozilla*, 940 F.3d. at 75 (quoting 47 U.S.C. § 154(i)), but that authority extends only to matters "reasonably ancillary to the … effective performance of its statutorily mandated responsibilities," *Am. Library Ass'n v. F.C.C.*, 406 F.3d 689, 692 (D.C. Cir. 2005).

3

### B.  The FCC's 2018 Order

In 2015, the FCC issued an order classifying BIAS as a Title II "telecommunications service" and adopting detailed net neutrality rules and protections.  *See In the Matter of Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 ¶ 331 (2015) ("2015 Order").[2] The FCC reversed course in 2018, however, and issued an order reclassifying BIAS as a Title I "information service." *In the Matter of Restoring Internet Freedom*, 33 FCC Rcd. 311, ¶¶ 26-64, 65-85, 263-283 (2018) ("2018 Order"), *vacated in part*, *Mozilla*, 940 F.3d 1.

In reclassifying BIAS under Title I, the FCC disclaimed its authority to impose generally applicable net neutrality conduct rules on BIAS providers, 2018 Order, ¶¶ 267-294, repealed the conduct rules promulgated in the 2015 Order, *see, e.g.*, *id*. at ¶ 239, and adopted a "Preemption Directive," which purported to prohibit state and local jurisdictions from enacting "any measures that would effectively impose rules or requirements that we [the FCC] have repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that we adopt in this order," *id*. ¶ 195.

In *Mozilla*, the D.C. Circuit upheld certain aspects of the 2018 Order, but it vacated the Preemption Directive in its entirety, holding that the FCC has no "authority to displace state laws" providing net neutrality protections for information services because the FCC had disclaimed any such regulatory authority over those services under Title I. *Mozilla*, 940 F.3d at 76. The court further found preemption to be inconsistent with "the Communication Act's vision of dual federal-state authority and cooperation in this area." *Id.* at 81.

---

[2] The 2015 Order was challenged by various industry groups and was upheld by the D.C. Circuit. *U.S. Telecom Ass'n v. F.C.C.*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, 139 S. Ct. 475 (2018).

4

### C.  The Affordable Broadband Act

**1.      The ABA is an Exercise of the State's Police Power to Ensure That All New Yorkers Have High-Speed Internet Access, a Necessity of Modern Life**

On April 16, 2021, Governor Cuomo signed the ABA into law, explaining that: "High-speed internet is essential to our everyday lives, and as we continue to reopen our state and adjust to new norms that have been shaped by the [COVID-19] pandemic, we need to make sure every household has access to affordable internet."[3]

The legislative history of the ABA makes clear that it was enacted in furtherance of the State's police power to protect its unserved and underserved residents, particularly because of the economic and other difficulties that so many New Yorkers have faced and continue to face from the ongoing COVID-19 pandemic.  As the ABA's sponsors explained:

> The challenges we have faced this year as a result of the COVID-19 pandemic have made it abundantly clear that affordable internet access must be accessible for all New Yorkers. It has become an essential service in its own right - from working at home to online learning, no one can successfully participate in 21st Century life without the internet. No New Yorker should be without broadband internet service because they cannot afford a robust connection, and no one suffering from the economic impact of the pandemic should lose access because they have lost their income.

Sponsor Memo A6259 2021 (attached as Exh. B to the accompanying Declaration of Patricia M. Hingerton ("PMH Decl.")). Broadband affordability is likewise "vital to appointment making for New York residents to receive the COVID-19 vaccine, participate in telemedicine appointments, for students to continue their education, and allow family members the ability to continue to work remotely."  Sponsor Memo S5525 2021 (PMH Decl., Exh. C).

---

[3]  https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-establishing-first-nation-program-provide-affordable-internet (Apr. 16, 2021).

5

2.      **The ABA Does Not "Rate Regulate" Broadband Services**

By its terms, the ABA applies only to those BIAS providers that elect to "provide wireline, fixed wireless or satellite broadband service in New York," requiring them to offer BIAS to qualifying, low-income consumers at or below specific price ceilings.  GBL § 399-zzzzz(2). Specifically, those providers must offer, for no more than $15 per month, broadband service at a minimum download speed of not less than 25 megabits per second.  *Id*. at (2)-(3).   Providers also comply with the Act if they offer broadband service at a minimum download speed of 200 megabits per second for no more than $20 per month.  *Id*. at (4).

The requirements of subsections (2) & (3) of GBL § 399-zzzzz "shall not apply to any broadband service provider providing service to no more than twenty thousand households, if the public service commission [("PSC")] determines that compliance with such requirements would result in unreasonable or unsustainable financial impact on the broadband service provider."  *Id.* at (5).  The PSC may also establish exceptions to the ABA's requirements where the broadband plans mentioned in the statute are "not reasonably practicable" to provide.  *Id.* at (2).[4]

## STANDARDS FOR THE ISSUANCE OF PRELIMINARY INJUNCTIVE RELIEF

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis in original, internal quotation marks omitted).  When seeking a preliminary injunction that will affect government action taken in the public interest, the moving party must show: (1) "it will suffer irreparable harm absent the

---

[4] In addition, broadband service providers may, after set periods of time, increase the prices of their services after providing notices to their customers and the Department of Public Service. *Id.* at (3)-(4). The statute also places certain compliance reporting obligations on providers, *id*. at (8) and requires them to make "all commercially reasonable efforts to promote and advertise the availability of broadband service for low-income consumers," *id*. at (7).

injunction and (2) a likelihood of success on the merits." *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1998) (internal quotation marks omitted). "As a final consideration, whenever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Id.* at 233; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of hardships to plaintiffs and the public interest factors merge when the government is a party).

Plaintiffs contend that this Court may also enter a preliminary injunction where there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly" in favor of such relief. *See* Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pl. Memo"), pp.6-7. This Court, however, should not apply the less rigorous "serious questions" standard here because Plaintiffs are seeking to enjoin government action expressly taken in the public interest. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, n.4 (2d Cir. 2010). In any event, as discussed below, this application should be denied in its entirety because Plaintiffs have not met the requirements for obtaining injunctive relief under any standard.

## **ARGUMENT**

## I. **PLAINTIFFS HAVE NOT DEMONSTRATED IMMINENT IRREPARABLE HARM, AND THE BALANCE OF THE EQUITIES WEIGHS SHARPLY AGAINST A PRELIMINARY INJUNCTION HERE**

### A. Plaintiffs' Asserted Harms Are Completely Speculative

Irreparable harm analysis "is the *sine qua non* for preliminary injunctive relief," *USA Recycling v. Town of Babylon*, 66 F.3d 1272, 1294-95 (2d Cir. 1995), *cert. denied*, 517 U.S. 1135 (1996), as Plaintiffs themselves concede. *See* Pl. Memo, p.6. "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied

7

by an award of monetary damages." *Rodriguez*, 175 F.3d at 234 (internal quotation marks omitted).  If the moving party fails to demonstrate irreparable harm, the other factors for a preliminary injunction <u>should not even be considered</u> by the court.  *See id.*  The burden of proof and persuasion rests squarely on the movant to establish irreparable harm.  *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66-67 (2d Cir. 2007).  Plaintiffs have failed to carry their burden of demonstrating the kind of imminent, concrete harms necessary to enjoin a statute that will immediately benefit countless low-income New Yorkers who currently lack affordable internet access.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co*., 434 U.S. 1345, 1351 (1977) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

First, the economic effects of the ABA on Plaintiffs are far from certain.  All of Plaintiffs' alleged harms are based upon their conclusory assertions about future events, and none are supported by financial records of any sort.  Declarants speculate, for example, that their companies will "*most likely*" turn down grants and cancel projects (Baase Decl. ¶ 6); may have "*possible*" quality and security issues in their network (Faulkner  Decl. ¶ 21); or *may* elect to change their business practices.[5]  This is hardly the type of tangible and non-speculative harm necessary for granting injunctive relief.  *See New York v Nuclear Regulatory Com.*, 550 F2d 745, 755 (2d Cir. 1977) (harm alleged for a preliminary injunction must not be remote or speculative but actual and imminent).

---

[5] *See also, e.g.*, Manner  Decl. ¶ 7) (suggesting that Hughes Network Systems, LLC, will be required to create a verification system which  "*will likely*" prove complex and expensive); Miller Decl. ¶¶ 7, 9 ("*assuming*" half of DTC's customers qualify for the ABA; charging more to higher income customers would "*likely*" cause them to switch services; speculating on lost income and reduced workforces); Webster Decl. ¶¶ 7, 9 (costs of providing service "*may*" exceed a certain amount; verification of eligibility will "*likely*" prove expensive); Coakley Decl. ¶ 8 (estimations of what costs could "*potentially*" be dependent on the nature of the work needed).

8

 Nor does Plaintiffs' speculation about future injury take into account the substantial *benefits* that some BIAS providers, particularly large providers such as Verizon, are likely to gain from the ABA in the form of new customers (who would otherwise not be able to afford their services). In addition, it is far more likely that *all* BIAS providers will gain goodwill rather than lose goodwill by offering lower broadband subscription rates. Plaintiffs also fail to acknowledge that any future harms may be diminished by the existence of federal programs that provide subsidies to low-income consumers for broadband internet service: to the extent New York consumers choose to rely on these federal benefits to purchase more expensive service rather than purchase service under the ABA, any economic effects of the ABA will be reduced.

Second, Plaintiffs fail to allege the kind of "'*imminent*' harm … required to sustain a preliminary injunction." *See Rodriguez*, 175 F.3d at 235 (emphasis added). Plaintiffs have alleged, by and large, that the ABA has the long-term effect of changing their incentives for future investments. Empire Telephone Corporation, for example, asserts that, if the ABA goes into effect, it may cancel a long-term project to expand its fiber optic network. *See* Baase Decl. ¶ 6. MTC Cable likewise alleges that the ABA will cost it revenue necessary to repay its debt. *See* Faulkner Decl. ¶ 18. Such future harm is simply too remote to support an immediate injunction against a duly enacted state law.

Third, it is not even clear that many or even most of Plaintiffs' members will be required to comply with the ABA. Verizon, for example, suggests that the ABA is unlikely to apply to its limited DSL and LTE Home services. Coakley Decl. ¶¶ 12-19. Because it appears that Verizon's DSL service cannot meet the speed requirements of the statute, it may not be subject to the law.

9

*Id.*; GBL § 399-zzzzz(2).  Moreover, its Home LTE service varies in download speed, with a maximum speed of 25 mbps – not the minimum of 25 mbps set by statute.[6]

Qualifying providers can also seek exemptions from PSC under the statute. *See* GBL §§ 399-zzzzz(2), (5). Numerous companies, including four of the six business that submitted declarations in support of a preliminary injunction, have submitted such requests, thus asserting that they satisfy the requirements for the exemption.[7]  PSC expects to hold a hearing on May 19, 2021 to, among other things, address exemption applications, and may render moot these Plaintiffs' claimed harms before this application is even heard.

Finally, Plaintiffs have alleged little more than potential financial harm in the form of lost revenue.  But "[m]onetary loss alone will generally not amount to irreparable harm"; otherwise, most applicants would qualify, rendering this "extraordinary" remedy common place.  *Borey v. National Union Fire Ins. Co*., 934 F.2d 30, 34 (2d Cir. 1991).

## B. The Equities Weigh Strongly in the State's Favor

In contrast to the speculative and unsupported nature of Plaintiffs' alleged harms, there would be serious harm to the public interest if this Court were to enter a preliminary injunction blocking this important public policy from coming into effect.

As discussed *supra*, the State Legislature recognized that high-speed internet access is a necessity of modern life, with New Yorkers dependent upon it to conduct the daily activities of their everyday lives, including working, attending school, obtaining COVID-19 vaccines, and accessing healthcare services.  As the Citizens Budget Commission also recognized, "With

---

[6]  *See*   https://www.slashgear.com/verizon-lte-home-internet-service-gets-massive-expansion-across-us-03640945/.
[7]  *See*   http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=21-m-0290&CaseSearch=Search.

10

millions of students beginning a new school year and many workers still telecommuting, high-speed, reliable internet has never been more critical for New Yorkers." *See* CBC Report September 2020, p.1.[8] The ABA is just one part—albeit a critical one—in State efforts to expand broadband service to every citizen. *See* Broadband for All program, described at https://www.ny.gov/programs/broadband-all.

Absent the ABA, many families at the lowest end of the financial spectrum cannot afford the type of broadband service necessary to allow children to meaningfully participate in their education, or parents to work from home. Given that the Plaintiffs themselves recognize that a reduction in cost is necessary to address the needs of a significant portion of potential broadband users, *see, e.g.,* Pl. Memo, p.21; Coakley Decl. ¶¶ 4-6, the public benefits of the ABA are *enormous* and will stretch over generations as those families obtain the full benefits of education, work, healthcare access, and more, in a society that is increasingly, and by necessity, dependent on BIAS access. And the harms that would befall low-income New Yorkers from enjoining the ABA easily outweigh the speculative, long-term effects that Plaintiffs surmise here.

Plaintiffs contend that the hardship to low-income consumers is already addressed by federal benefit programs. *See* Pl. Memo, pp.23-24. But the Legislature rationally determined that these benefits—at least one of which is temporary and voluntary—are insufficient to ensure that low-income New Yorkers have affordable access to broadband internet service.[9] And the necessity of access to affordable broadband service will not disappear as the State emerges from the

---

[8] https://cbcny.org/sites/default/files/media/files/CBCBRIEF_Broadband-NY_09252020.pdf

[9] The Emergency Broadband Benefit provides a monthly discount of up $75 towards service for eligible households during the pendency of the COVID-19 pandemic. *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, § 940 (2020). Without an affordable pricing scheme, it is possible that the subsidies provided under the program will drive up broadband prices, as providers seek to maximize the program's subsidy.

11

pandemic, as society in general moves further into a hybrid style of life that necessarily takes place in-person and at home for school, work and everyday activities such as shopping, health care and other necessary appointments.  Notably, nothing in any of these federal programs suggests that Congress intended to preclude States from making such reasonable policy judgments.  To the contrary, Congress has repeatedly reaffirmed the role of the States in ensuring universal broadband access.  *See, e.g.*, 47 U.S.C. § 254(f) ("A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service.").  And the fact that the federal government too has focused on the accessibility of broadband internet service to low-income consumers only confirms the strong public interest in providing such access; a preliminary injunction here would improperly undermine that interest.

## II.  PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR PREEMPTION CLAIMS

"[B]ecause the States are independent sovereigns in our federal system," any preemption analysis must begin "with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quotation marks omitted). "[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case." *Id.* at 485 (quotation marks omitted).  As discussed below, Plaintiffs have failed to establish that the "clear and manifest purpose of Congress" was to preempt the State's exercise of its police powers to protect those in unserved and underserved communities.  Thus, their preemption theories fail.

### A.   Congress Has Not Preempted the Field

Field preemption requires a showing that "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement

it." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quotation marks omitted). This doctrine has no application here.

As explained above, the Act establishes a "*dual* regulatory system" for communications. *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 360. While the Act confers substantial regulatory authority on the FCC with respect to "interstate and foreign communication by wire and radio," § 152(a), it explicitly denies the FCC jurisdiction over "intrastate communication services," including over state "charges, classifications, practices, services, facilities or regulations," *id.* § 152(b). Through this division of authority, the Act preserved the States' ability to regulate communications services as necessary to "protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." *Id.* § 253. Although the 1996 Act expressly conferred authority on the FCC over certain interstate matters, the States' retained substantial regulatory authority, and courts have repeatedly rejected claims of field preemption in this area given the express reservation of the States' police power to regulate communications in § 152(b) and elsewhere.[10] *See, e.g. Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998).

Notably, courts have rejected claims of field preemption even when States seek to regulate *interstate telecommunications* services—services at the heart of the FCC's jurisdiction. *See, e.g.*, *In re NOS Commc'ns*, 495 F.3d at 1058 (no preemption of state-law claim for false billing practices by telecommunications carrier); *Tennessee v. FCC*, 832 F.3d 597, 612 (6th Cir. 2016) (no

---

[10] *See also, e.g.*, *In re NOS Commc'ns*, 495 F.3d 1052, 1058 (9th Cir. 2007) (stating that the Act "is fundamentally incompatible with complete field preemption"); *Johnson v. American Towers, LLC*, 781 F.3d 693, 703 (4th Cir. 2015) ("[W]e hold that the Communications Act does not 'wholly displace[]' state law in this area because it explicitly preserved state-law remedies."); *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) ("[B]ecause state law expressly supplements federal law in the regulation of interstate telecommunications carriers, field preemption does not apply.").

13

preemption of state laws governing municipal broadband); *ACA Connects v. Becerra,* No.18-CV-2684, ECF Doc. 16-8 (E.D. Cal. Feb. 23, 2021), *appeal pending*, No.21-15439 (9th Cir.) (no preemption of state-law net neutrality regulations).  Here, the case for field preemption is even weaker because the ABA's accessible-pricing regime is narrower and should not be understood to regulate in that field at all.  The core purpose of the ABA is not to regulate the "transmission . . . of information" by BIAS providers. *See* 47 U.S.C. § 153(50).  Rather, the law sets an affordable price regime for certain broadband products sold to a limited segment of New York's population: low-income consumers who qualify for certain benefits. *See* GBL § 399-zzzzz(2). Companies that have chosen to provide service in New York—many of which provide service exclusively within the State—must provide broadband to New Yorkers at or below the price ceiling contained in the ABA.  This kind of purely intrastate affordable-pricing scheme falls well within the State's reserved power to "safeguard the rights of consumers" within the State, and does not encroach on any field where Congress intended federal jurisdiction to be exclusive.[11] *See* 47 U.S.C. § 253(b); *see also People ex rel. Schneiderman v. Charter Commc'ns, Inc.*, 162 A.D.3d 553, 554 (1st Dep't 2018) (affirming State's authority to safeguard the rights of consumers over similar preemption claims).

---

[11] Plaintiffs miss the mark when they contend all broadband service is inherently interstate.  The authorities on which plaintiffs rely recognize only that broadband has interstate elements such that the FCC has jurisdiction to regulate it, not that the states lack concurrent regulatory authority. *See, e.g.*, Memorandum Op. & Order, *NARUC Petition for Clarification or Declaratory Ruling*, 25 FCC Rcd 5051, ¶ 8 n.24 (2010) ("Although the Commission has acknowledged that broadband Internet access service traffic may include an intrastate component, it has concluded that broadband internet access service is properly considered jurisdictionally interstate for regulatory purposes.").   Congress itself has recognized that there are severable, intrastate elements to broadband.   Among other things, Congress preserved States' substantial authority over critical aspect of broadband infrastructure and deployment, such as local rights-of-way. *See, e.g.*, 47 U.S.C. § 332(c)(7) (states retain authority "regarding the placement, construction, and modification of personal wireless service facilities"); *cf. Mozilla*, 940 F.3d at 100-01, 103-04 (assuming the possibility of intrastate regulation of broadband).

14

To support their argument that the Act effects field preemption, Plaintiffs rely on a single statutory provision:  47 U.S.C. § 152(a), which confers authority on the FCC to regulate certain interstate communications.  But Plaintiffs' argument depends on the mistaken view that the ABA is an interstate-communication statute, rather than an intrastate pricing regulation.  More fundamentally, Plaintiffs ignore the fact that § 152(a) focuses entirely on federal—not state—authority.  And it is well-established that statutory provisions defining the scope of a federal agency's jurisdiction do not, standing alone, displace state authority, especially not with respect to exercises of the states' historic police powers.  *See English v. General Elec. Co.*, 496 U.S. 72, 87 (1990) ("[T]he mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies."); *see also Metrophone Telecomms., Inc. v. Global Crossing Teles., Inc.*, 423 F.3d 1056, 1072-73 & n.10 (9th Cir. 2005) (same).

Moreover, if Plaintiffs were correct that § 152(a), standing alone, broadly preempts state law, it would render superfluous numerous provisions of the Act that expressly preempt the states from regulating certain aspects of interstate services not applicable here, including state rate-making for mobile services.  *See, e.g.*, 47 U.S.C. § 253(a) (states cannot prohibit the ability of any entity to provide any interstate or intrastate telecommunications service); *id.* § 332(c)(3)(A) ("[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service.).  "[W]e are required to disfavor interpretations of statutes that render language superfluous." *Conn. ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82, 88 (2d Cir. 2000) (quotation marks omitted).

Plaintiffs mischaracterize the *Mozilla* court's holding on the issue of field preemption.  That decision rejected the FCC's attempt to preempt state regulatory authority.  Contrary to Plaintiffs' description, *Mozilla* did not hold that the Preemption Directive in the 2018 Order was

15

unlawful only because it touched upon *intrastate* communications.  Rather, *Mozilla* found that the Preemption Directive's intrusion on state regulation of intrastate communications was *especially* egregious because such "preemption treads into an area . . . over which Congress expressly denied the Commission regulatory authority."  940 F.3d at 78-79 (alteration & quotation marks omitted). *Mozilla* vacated the Preemption Directive in its entirety, principally based on the conclusion that the FCC has no "authority to displace state [neutrality] laws" regulating information services because the FCC had disclaimed such authority under Title I.  *Id.* at 76. *Mozilla* expressly noted the "Act's vision of dual federal-state authority and cooperation in this area."  *Id.* at 81. Thus, neither the relief nor the reasoning of *Mozilla* was limited to intrastate communications.

Plaintiffs also mischaracterize this Court's decision in *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490-91 (2d Cir. 1968).  *Ivy* considered whether a federal court had jurisdiction over negligence and breach of contract claims against a common carrier regulated under Title II of the Act.  *See* 391 F.2d at 488.  Subsequent cases of the Supreme Court and this Court have called *Ivy*'s reasoning into question.  *See, e.g.*, *AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214, 220 (1998) (referring to a contract claim against a telecommunications carrier as a "state-law claim[]"); *Marcus*, 138 F.3d at 53-55 (state-law claims for deceptive practices, false advertising, and negligence were not completely preempted under the Act).[12]  In any event, *Ivy* concluded only that the particular state-law claims there—which challenged the adequacy of a provider's service— were preempted by the FCC's comprehensive Title II regulations concerning the "duty to furnish adequate and efficient service." *Ivy*, 391 F.2d at 490-91.  Unlike *Ivy*, this case does not involve

---

[12] *See also, e.g.*, *A.S.I. Worldwide Commc'ns Corp. v. WorldCom, Inc.*, 115 F. Supp. 2d 201, 207 (D.N.H. 2000) (noting that *Ivy* is "inconsistent with the Supreme Court's modern preemption jurisprudence" and is in tension with the decisions of multiple courts of appeals); *Levcor Int'l v. MCI WorldCom Commc'ns, Inc.*, 2001 WL 716918, at *4 n.3 (S.D.N.Y. June 26, 2001) (noting that *Ivy* "is inconsistent with *Central Office*" and has been "implicitly repudiated" by the 2d Cir.).

16

Title II regulations—the FCC has disclaimed such regulations for broadband internet—and nothing in *Ivy* suggested that a purely intrastate affordable pricing scheme would be preempted under the circumstances presented here.

### B.   Conflict Preemption Does Not Apply

Plaintiffs' claims of conflict preemption are also meritless.  Conflict preemption requires a showing that state law "actually conflicts with federal law." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983).  A party must demonstrate either that "it is impossible for a private party to comply with both state and federal requirements," *English*, 496 U.S. at 79, or that the application of state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (quotation marks omitted). Moreover, conflict "[p]re-emption is ordinarily not to be implied absent an 'actual conflict.'" *English*, 496 U.S. at 90. This principle prohibits "seeking out conflicts between state and federal regulation where none clearly exists." *Id.* (quotation and alteration marks omitted). Here, Plaintiffs have pointed to no federal law in actual conflict with the ABA.

### 1.   The ABA Does Not Conflict with the Act

Plaintiffs argue that the ABA conflicts with the Act because it imposes "common carrier" regulations on information services, which (unlike telecommunications services) cannot be subject to common carrier treatment.  They are wrong.

### a.   The ABA Is Not a *Per Se* Common Carrier Regulation

As an initial matter, the core premise of Plaintiffs' argument—that the ABA is a "common carrier" regulation—is wrong.  As explained above, the ABA's accessible pricing scheme is an exercise of the State's "historic police powers" to ensure that its most vulnerable residents can

17

purchase high-speed internet at affordable prices. That accessible price regime is a far cry from per se common carrier regulation. "[N]ot every limitation on an entity's discretion concerning with whom and how it will deal is necessarily common carriage." *Cellco P'ship v. FCC*, 700 F.3d 534, 537 (D.C. Cir. 2012). Rather, common carrier regulation has a specific, historical meaning and occurs only when carriers are required "to offer service indiscriminately and on general terms." *Id.* The ABA does not impose such a requirement.

*First,* the ABA applies only to broadband service providers that have chosen to do business in the State, and is further limited to a discrete subset of customers, i.e., qualifying low-income consumers. *See* GBL § 399-zzzzz(1)-(2). With regard to the rest of the State, Plaintiffs have the discretion to make individualized decisions as to the rates they will charge and the terms under which they will provide service.[13] This "substantial room for individualized bargaining and discrimination in terms" offered to all other State residents takes the ABA out of *per se* common carriage status. *See Cellco P'ship,* 700 F.3d at 548.

*Second*, the ABA leaves providers with discretion regarding the service they provide by setting a price ceiling rather than a direct rate schedule. The ABA requires companies to provide broadband service at "no more than fifteen dollars" for high-speed internet at 25 megabits per second, or for no more than $20 per month for service at 200 megabits per second. *Id.* § 399-zzzzz(2)-(4). Below these ceilings, providers retain discretion to determine the cost and speed of service. And although the ABA provides some conditions on the terms of service, these requirements are simply ancillary to, and necessary for, the effectiveness of the price accessibility

---

[13] It is apparent from a review of Declarants' companies' websites that many of them offer a wide variety of broadband services to both residential and commercial subscribers. *See, e.g.,* Bundle Rates, https://www.delhitel.com/bundles-2/ (last visited May 17, 2021) (showing 11 different service packages offering broadband internet, plus 5 separate "internet upgrade" speed packages).

requirement.   The core foundation of Plaintiffs' argument—that the ABA is a "rate-regulation" that imposes *per se* common carrier status upon them—is thus incorrect.

### b.    Section 153(51) Applies Only to the FCC

In any event, and more fundamentally, Plaintiffs' attempt to assert conflict preemption from 47 U.S.C. § 153(51) misconstrues the nature and scope of that provision.

Section 153(51) is a definitional provision that was added by the 1996 Act and provides that the *FCC* may impose common carrier regulations on a "telecommunications carrier" "only to the extent that [a carrier] is engaged in providing telecommunications services."  That section, by its plain terms, limits only the FCC's authority to impose common carrier regulation under the Act.  *See Mozilla*, 940 F.3d at 79 (describing § 153(51) as "a definitional provision," that "is a *limitation* on the Commission's authority"); H.R. Rep. No. 104-458, at 114 (1996) ("Conf. Rep.") ("The definition amends the Communications Act to explicitly provide that a 'telecommunications carrier' shall be treated as a common carrier fo*r purposes of the Communications Act . . .*" (emphasis added)).  And, in *Mozilla*, the D.C. Circuit rejected this exact statute as a basis for preempting the States' regulatory powers.  *Id.*  Plaintiffs' attempt to re-assert that same argument here fails for similar reasons.

At base, Plaintiffs' conflict-preemption argument mistakenly presumes that limitations on *the FCC's* power to impose common carrier regulations implicitly apply to the States as well. There is no plausible reading of § 153(51), however, which would limit a *state's* power to regulate BIAS.[14] When states adopt laws under their traditional police powers, they do not do so under the

---

[14] Contrary to Plaintiffs' suggestion, *Computer and Communications Industry Association v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) and *California v. FCC*, 39 F.3d 919 (9th Cir. 1994), which vacated and remanded *In the Matters of Amendment of Sections 64.702 of the Comm'n's Rules & Regulations (Third Comput. Inquiry)*, 2 F.C.C. Rcd. 3035 (1987), do not stand for the proposition

Act.  Because the states "entered the federal system with their sovereignty intact," *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991), they do not require Congress's approval to exercise their historic police powers.  *See Graham v. R.J. Reynolds Tobacco Co*., 857 F.3d 1169, 1190 (11th Cir. 2017) ("Although federal agencies have only the authority granted to them by Congress, states are sovereign.").

Two additional provisions of the Act confirm that there is no preemption here.  For one thing, Congress knew how to preempt state common-carrier regulations and did so expressly in other provisions of the Act—but not here.  Specifically, under Title II, the FCC is authorized to directly set interstate rates for common carriers, *see* 47 U.S.C. §§ 201-03, or formally forbear from doing so when it determines, among other things, that rate regulation would not be "consistent with the public interest," *id.* § 160(a).  The Act then expressly forbids a State from continuing "to apply or enforce any provision" of the Act "that the Commission has determined to forbear from applying" under § 160(a), including an FCC decision to forebear from imposing rate regulations, *see* § 160(e).  But as the D.C. Circuit has recognized, § 160's preemption provision "has no work to do here because the 2018 Order took broadband out of Title II."  *Mozilla*, 904 F.3d at 102.[15]

---

that Congress intended § 153(51) to apply to the states or otherwise limit state regulation.  Both cases predate the enactment of section 153(51), and so do not interpret it.

[15] Unlike here, where the FCC has disclaimed regulatory authority to impose certain requirements on Title I information services, all of the cases on which Plaintiffs rely involved actions where the agency unquestionably had the power to impose regulations.  *See, e.g*., *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699-700, 708-09 (1984) (finding preemption where FCC had exclusive jurisdiction to regulate transmission of cable television signals); *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd*., 330 U.S. 767, 775 (1947) (federal agency's "refusal to designate [certain] bargaining units was a determination and an exercise of its discretion to determine that such units were not appropriate for bargaining purposes").  Plaintiffs also cite *Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss*., 474 U.S. 409, 422-23 (1986), but that case concerned field preemption, not conflict preemption, and involved "a comprehensive scheme of federal regulation of all wholesales of natural gas in interstate commerce." 474 U.S. at 419 (citation omitted).  The Supreme Court found that the statute occupied the field and precluded state regulation.  *Id*. at 418.  As discussed in Point I, A, *supra*, the Act *embraces* state regulation, and does not preclude it.

20

Plaintiffs thus improperly seek to extend Title II's forbearance-based preemption regime into an area where Congress deliberately did not include any similar preemption provision.

Such an extension is particularly unjustifiable because of a separate provision, § 601(c)(1) of the 1996 Act (codified as amended at 47 U.S.C. § 152 note), under which Congress provided that there should be "no implied effect" from the provisions of the 1996 Law, and that the legislation "shall not be construed to modify, impair, or supersede Federal, State, or local law unless *expressly* so provided in such Act or amendments" (emphasis added).  Pub. L. No. 104-104, 110 Stat. 143.  The legislative history of § 601(c)(1) confirms that there can be no implied preemption based on provisions of the 1996 Act.  *See* Conf. Rep. at 201 (stating that § 601(c)(1) "prevents affected parties from asserting that the bill impliedly preempts other laws").[16]  Courts have similarly recognized that the provision "counsel[s] against any broad construction" of the 1996 Act's other provisions—which include 47 U.S.C. § 153(51) —"that would create an implicit conflict with" state law.  *Pinney v. Nokia,* 402 F.3d 430, 458 (4th Cir. 2005); *see also, e.g.*, *AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003) (§ 601(c)(1) [erroneously cited as "47 U.S.C. § 609 note"] "precludes a reading that ousts the state legislature by implication").

Plaintiffs' conflict preemption argument thus fails because it is based on a statute that limits federal power, not state power, and because their argument improperly implies preemption when Congress has expressly warned against such implications and has deliberately chosen to preempt

---

[16]  In *Geier v. American Honda Motor Co.*, the Supreme Court concluded that the general savings clause at issue in that case did not automatically "bar the ordinary work of conflict pre-emption principles."  529 U.S. 861 (2000).  But as courts have recognized, § 601(c)(1) "is not an ordinary saving clause."  *Cohen v. Apple*, 497 F. Supp. 3d 769, 778 (N.D. Cal. 2020).  Rather, it includes precise language making clear Congress's intent to prevent interpretations of the 1996 Act that would result in implied preemption.

state rate regulation in other provisions of the Act—but not in the provisions that are applicable here.  On top of all of that, Plaintiffs' preemption argument is particularly inapt because the ABA is at its core an intrastate price regulation that enables low-income New Yorkers to access broadband internet service.  In *Louisiana Public Service Commission*, the Supreme Court rejected the FCC's attempt to preempt state rules governing the depreciation of assets at telephone plants—rules that significantly affected the rates that telephone companies charged consumers.  *See* 476 U.S. at 360-64. As the parties to that case conceded—and the Court recognized—§ 152(b) of the Act "was from the outset concerned with protection against federal preemption of the states' setting of individual customer charges for specific intrastate services." *Id.* at 371.  The Act therefore "fences off from FCC reach or regulation intrastate matters—indeed, including matters 'in connection with' intrastate service." *Id.* at 370; *see also Global Tel*Link*, 866 F.3d at 403 ("the field of intrastate communications service" remains "the province of the states" (quotation marks omitted)).  For similar reasons, there is no basis for finding a conflict when, as here, a State is appropriately exercising its police powers in an area where Congress has respectfully left space for such state regulation.

### 2.   The ABA Does Not Conflict with the 2018 Order

Plaintiffs separately argue that the ABA conflicts with the FCC's 2018 Order and certain policy decisions therein, but neither contention has merit.  As an initial matter, Plaintiffs are simply wrong in contending that either the 2015 or 2018 Orders reflect a considered policy preference against the kind of accessibility pricing enacted by the ABA.  Plaintiffs rely on a single paragraph (out of 576) in the 2018 Order—but that paragraph merely parrots *providers*' concerns about *federal* rate regulation.  *See* Pl. Memo. at p. 9; Compl. ¶ 39; *see also* 2018 Order, ¶ 101 (noting that "*providers* have asserted that … they were less willing to invest due to concerns that the

22

Commission could reverse course in the future and impose a variety of costly regulations on the broadband industry—such as rate regulation" (emphasis added)).  Plaintiffs also point to two paragraphs (out of 67) in the 2015 Order, which explained the FCC's decision to forbear from *federal* ratemaking under Title II when the FCC reclassified broadband as a telecommunications service; but, as discussed, Title II is inapplicable here in light of the 2018 Order's decision to reclassify broadband as a Title I information service.  *See* Pl. Memo. at pp.9-10 (discussing 2015 Order, ¶¶ 382, 451). In any event, none of these offhand mentions of federal ratemaking amount to a federal policy against *any* form of price regulation, much less the kind of narrow, intrastate price accessibility regime enacted by the ABA.

More fundamentally, even assuming that the FCC has expressed some policy preference against ratemaking (or price regulation more broadly), that mere preference is not enough to preempt the States' historic police powers.  When considering whether a state law is in conflict with agency action, courts must determine "whether that action is within the scope of the [agency's] delegated authority." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982).  Courts "simply cannot accept an argument that the FCC may" preempt state law merely because "it thinks [preemption] will best effectuate a federal policy.  An agency may not confer power upon itself." *Louisiana*, 476 U.S. at 374. Thus, agency regulations may preempt state law only if the agency has delegated authority over the subject matter.

This basic principle defeats Plaintiffs' claim that the 2018 Order preempts the ABA.  By reclassifying BIAS as a Title I information service and then *disclaiming* authority under Title I to impose certain restrictions, the FCC lost any statutory authority it otherwise might have had to preempt the states; its reclassification decision resulted in a *lack* of authority to regulate BIAS, not

23

the setting of a deregulatory agenda that could be imposed on the states. *See Mozilla*, 940 F.3d at 76 (the 2018 Order "placed broadband *outside* of [the FCC's] Title II jurisdiction").

Plaintiffs attempt to restyle this lack of authority to regulate as the power to affirmatively deregulate, but *Mozilla* rejected this interpretation too: "If Congress wanted Title I to vest the Commission with some form of Dormant-Commerce-Clause-like power to negate States' statutory (and sovereign) authority just by washing its hands of its own regulatory authority, Congress could have said so." *Mozilla*, 940 F.3d at 83; *see also ACA Connects - Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 326 (D. Me. 2020) (2018 Order was not "affirmative deregulation," but instead reflected FCC's recognition that "it lacked authority to regulate in the first place").[17]

Equally unpersuasive is Plaintiffs' contention that the ABA conflicts with the FCC's policy preferences about the appropriate level of regulation for BIAS, including its asserted preference, articulated in both the 2018 and 2015 Orders, that the agency should not impose rate regulations on broadband. The FCC's policy preferences cannot serve to as a basis for preemption. *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) ("the only agency actions that can" preempt state law are the agency's exercises of "congressionally delegated authority," because "[t]he Supremacy Clause grants 'supreme' status only to the 'the *Laws* of the United States'"). The Supreme Court has made clear that a federally mandated policy of deregulation cannot be enacted silently or by administrative fiat. The preemption of state laws represents "a

---

[17]   The cases that Plaintiffs cite in support of this argument do not assist them because they recognize that an agency's decision not to regulate may have preemptive effect *only if the agency possesses statutory authority to regulate in the first place. See Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) (agency must have the power to issue "an authoritative federal determination" regarding the appropriate regulatory approach); *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 174, 178 (1978) (federal agency's decision not to ban oil tankers of a certain size preempted state regulation seeking to do so, where "[w]e begin with the premise that the Secretary has the authority to establish 'vessel size and speed limitations[.]'").

24

serious intrusion into state sovereignty." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1904 (2019) (opinion of Gorsuch, J.) (quotation marks omitted). "[A]ny [e]vidence of pre-emptive purpose, whether express or implied, must therefore be sought in the text and structure of the *statute* at issue." *Id.* at 1907 (emphasis added) (quotation marks omitted). "Without a [statutory] text that can . . . plausibly be interpreted as *prescribing* federal preemption it is impossible to find that a free market was mandated by federal law." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988) (emphasis added). In this case, Plaintiffs point to no such statutory text.[18] And none of the plaintiffs' cases are to the contrary.[19]

## CONCLUSION

For all of these reasons, this Court should deny Plaintiffs' application for a preliminary injunction.

Dated: Hauppauge, New York
      May 17, 2021

Respectfully submitted,
LETITIA JAMES
Attorney General of the State of New York,
Defendant

By: _____

PATRICIA M. HINGERTON
Assistant Attorney General
300 Motor Parkway, Suite 230
Hauppauge, N.Y. 11788

---

[18] Further, there is no evidence that Congress intended to preempt *state* regulation of information services, even if it had intended to curtail *federal* regulation of such services. As discussed above, Congress is well aware of how to preempt state laws.

[19] None of the cases Plaintiffs cite authorized preemption based on the FCC's policy preferences. *See California*, 39 F.3d at 931-32 (upholding a narrow preemption order where regulated companies could not physically comply with state laws and an FCC regulation enacted pursuant to the agency's ancillary authority); *Capital Cities*, 467 U.S. at 705 (finding a direct conflict between a state law requiring broadcasters to delete alcohol advertisements and an FCC regulation prohibiting broadcasters from deleting or altering cable signals).

25