UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

NEW YORK STATE
TELECOMMUNICATIONS ASSOCIATION,
INC., CTIA – THE WIRELESS
ASSOCIATION, ACA CONNECTS –
AMERICA'S COMMUNICATIONS
ASSOCIATION, USTELECOM – THE
BROADBAND ASSOCIATION, NTCA – THE
RURAL BROADBAND ASSOCIATION, and
SATELLITE BROADCASTING &
COMMUNICATIONS ASSOCIATION, on
behalf of their respective members,

**MEMORANDUM AND ORDER**

2:21-cv-2389 (DRH) (AKT)

Plaintiffs,

- against -

LETITIA A. JAMES, in her official capacity as
the Attorney General of New York,

Defendant.

-------------------------------------------------------------X

**APPEARANCES**

**MOLOLAMKEN LLP**
Attorneys for Plaintiff ACA Connects – America's Communications Association
600 New Hampshire Ave. N.W., Suite 500
Washington, D.C. 20037
By:     Jeffrey A. Lamken, Esq.
        Rayiner I. Hashem, Esq.

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
Attorneys for Plaintiffs New York State Telecommunications Association, Inc.,
        CTIA – The Wireless Association, USTelecom – The Broadband Association,
        and NTCA – The Rural Broadband Association
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
By:     Scott H. Angstreich, Esq.
        Joseph S. Hall, Esq.
        Andrew E. Goldsmith, Esq.

**HARRIS, WILTSHIRE & GRANNIS LLP**
Attorneys for Plaintiff Satellite Broadcasting & Communications Association
1919 M Street, N.W.
The Eighth Floor
Washington, D.C. 20036
By:     Jared Marx, Esq.
        Michael Nilsson, Esq.

**LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK**
Attorney for Defendant Letitia A. James
300 Motor Parkway, Suite 230
Hauppauge, N.Y. 11788
By:     Patricia M. Hingerton, Esq.
        Susan M. Connolly, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

On May 6, 2021, the captioned Plaintiffs, a group of trade associations whose members provide broadband internet service to New Yorkers, moved this Court under Federal Rule of Civil Procedure 65(a) for a preliminary injunction barring New York State Attorney General Letitia A. James from enforcing the Affordable Broadband Act, N.Y. Gen. Bus. Law § 399-zzzzz, which would require them by June 15, 2021 to offer qualifying low-income costumers high-speed broadband service at or below certain price ceilings.  For the reasons set forth below, Plaintiffs' motion is GRANTED.

## BACKGROUND

Internet access has transcended beyond mere luxury to modern necessity.  So integrated has the Internet become with contemporary American life that our nation adapted to—if not survived—the COVID-19 pandemic by relying on how easily it

facilitates access to our fundamental needs: *e.g.*, healthcare ("telehealth"), education ("remote learning"), employment ("work from home"), camaraderie ("social networking"). Def. Mem. in Opp. at 5 [DE 19] ("Def. Opp."). But the Internet's promise of access is only as promising as its accessibility – which depends in part on whether individuals can afford it.

The New York State Affordable Broadband Act's (the "ABA") stated purpose is to ensure all New Yorkers have access to affordable Internet. Signed into law April 16, 2021, the ABA regulates every New York "broadband service," defined as

> [a] mass-market retail service that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service provided by a wireline, fixed wireless or satellite service provider, . . . [excluding] dial-up service.

N.Y. Gen. Bus. Law § 399-zzzzz(1). The ABA covers every broadband service provider operating in New York except those serving "no more than twenty-thousand households" whose compliance, as determined by the New York State Public Service Commission (the "PSC"), "would result in unreasonable or unsustainable financial impact." *Id.* § 399-zzzzz(5). Plaintiffs are trade associations whose members provide "wireline, fixed wireless, or satellite broadband service"; they are "broadband service" providers. Compl. ¶¶ 12–18, 26.

The ABA mandates such providers offer, by June 15, 2021, all qualifying low-income households at least two Internet access plans: (i) download speeds of at least 25 megabits-per-second at no more than $15-per-month, or (ii) download speeds of at least 200 megabits-per-second at no more than $20-per-month. N.Y. Gen. Bus. Law §§ 399-zzzzz(2)–(4). A household qualifies if it:

(a) is eligible for free or reduced-priced lunch through the National School Lunch Program; or (b) is eligible for, or receiving the supplemental nutrition assistance program benefits; or (c) is eligible for, or receiving Medicaid benefits; or (d) is eligible for, or enrolled in senior citizen rent increase exemption; or (e) is eligible for, or enrolled in disability rent increase exemption; or (f) is a recipient of an affordability benefit from a utility.

*Id.* § 399-zzzzz(2). These qualifications cover approximately "[7] million New Yorkers and 2.7 million households,"[1] the latter of which exceeds one-third of all New York State households.[2]

Providers may raise prices only according to a statutory formula and only once every five years (for the $15 monthly plan) or two years (for the $20 monthly plan). *Id.* §§ 399-zzzzz(3)–(4). These Internet plans must be offered "on the same terms and conditions . . . as for the regularly priced offerings for similar service[s]" and on a standalone basis, *i.e.*, separate from any "bundled cable and/or phone services." *Id.* §§ 399-zzzzz(3), (5). Providers must "make all commercially reasonable efforts to promote and advertise" the plans. *Id.* § 399-zzzzz(7). The ABA empowers the New York State Attorney General, Defendant Letitia A. James, to seek injunctive relief against and civil penalties up to a $1000 per violation from any noncompliant providers. *Id.* § 399-zzzzz(10).

---

[1] Press Release, Governor Cuomo Signs Legislation Establishing First-in-the-Nation Program to Provide Affordable Internet to Low-Income Families (Apr. 16, 2021), https://on.ny.gov/2QZqDtl.

[2] U.S. Census Bureau, QuickFacts: New York, https://www.census.gov/quickfacts/fact/table/NY/HSD410219 (last accessed June 11, 2021) (7,343,234 households).

Plaintiffs brought this action on April 30, 2021, [DE 1], and on May 6, 2021 moved for a preliminary injunction barring Defendant from enforcing and giving effect to the ABA, Pls. Mem. in Support [DE 16] ("Pls. Mem."). Declarations from six executives at Plaintiffs' member organizations accompany Plaintiffs' briefs. *See* Declaration of Jim Baase ("Empire Tele. Decl."), Ex A. to Pls. Mem. [DE 16-1]; Declaration of Matthew Kramer Coakley, ("Verizon Decl."), Ex. B. to Pls. Mem. [DE 16-2]; Declaration of Glen Faulkner ("Heart of the Catskills Decl."), Ex. C to Pls. Mem. [DE 16-3]; Declaration of Jennifer Manner ("Hughes Network Decl."), Ex. D to Pls. Mem. [DE 16-4]; Declaration of Jason Miller ("Delhi Tele. Decl."), Ex. E to Pls. Mem. [DE 16-5]; Declaration of Mark T. Webster ("Champlain Tele. Decl."), Ex. F to Pls. Mem. [DE 16-6].

Defendant opposed on May 17, 2021 and advised that the PSC scheduled a hearing for May 19, 2021 to address pending exemption applications. Def. Opp. at 10. At the hearing, the PSC granted "temporary exemption[s] to allow for the orderly review and evaluation of the exemption requests" to several companies, four of whose executives submitted declarations in support of Plaintiffs' motion. Order Granting Temporary Exemptions attached to Def.'s May 20, 2021 Ltr. [DE 21] ("PSC Order"). The PSC issued a "Notice Soliciting Comment" on May 28, 2021, inviting public comment "on the criteria and factors that may be considered by the [PSC] in evaluating" the ABA's "unreasonable or unsustainable financial impact" exemption criteria. Ex. B to Pls. June 1, 2021 Ltr. [DE 24-2].

Plaintiffs submitted their Reply brief on May 21, 2021. Pls. Reply in Support [DE 23] ("Pls. Reply"). Oral argument was held on June 3, 2021.

## DISCUSSION

"To obtain a preliminary injunction against government enforcement of a statute, [a plaintiff] must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party of New York v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021).

First, the Court will address irreparable injury. "[T]he moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), for imminent, irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction." *Yang v. Kosinski*, 960 F.3d 119, 128 & n.32 (2d Cir. 2020)

Second, the Court analyzes Plaintiffs' likelihood of success on the merits, despite Plaintiffs' availment also of the alternative "serious questions" standard. Pls. Mem. at 6–7, 24. The Second Circuit "ha[s] repeatedly stated that the serious-questions standard cannot be used to preliminarily enjoin governmental action," *Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *rev'd on other grounds sub nom., Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 207 L.Ed.2d 951 (2020), and the ABA is the product of New York State's legislative process, *see Able v. United*

*States*, 44 F.3d 128, 131 (2d Cir. 1995) (instructing not to apply serious-questions standard to "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes [because they] are entitled to a higher degree of deference and should not be enjoined lightly").

Third, the Court balances the equities and weighs the public interest. *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 225 (2d Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). The Court finishes by addressing Federal Rule of Civil Procedure 65(c).

## I.     Imminent, Irreparable Harm

In the context of a preliminary injunction motion, irreparable harm must be "actual and imminent," not "remote," not "speculative," and not capable of remedy should "a court wait[] until the end of trial to resolve" the matter. *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66. If redressable through monetary damages, an injury ordinarily will not justify preliminary injunctive relief, *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)), unless the Eleventh Amendment precludes recovery of monetary damages, *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam)).

### A.     Parties' Arguments

Plaintiffs ground irreparable harm in a "Hobson's choice" whereby they suffer injury whether or not they comply with ABA. Should they choose noncompliance,

they face civil penalties and the Governor's "promise" that they "will lose [their] franchise in the State of New York." Should they comply, the ABA will "likely" require them to provide these services at a loss, raise advertising expenditures, impose administrative costs due to providers' need "to develop a system for validating customers' eligibility," force them to cancel preexisting business plans for upgrades to, and expansion of, their broadband networks, and inflict reputational harm. Pls. Mem. at 18–20.

Defendant counters that Plaintiffs "speculate" with "conclusory arguments" about "possible" future events, whose effects may be "long term" and not "imminent." Def. Opp. at 8–10. Defendant says Plaintiffs fail to consider the "benefits" providers "are likely to gain from the ABA," such as new customers and increased goodwill. *Id.* Defendant also notes an uncertainty as to whether or not certain of Plaintiffs' member organizations must comply with the ABA, considering the specific services they offer and the availability of exemptions. *Id.* With respect to the latter, Defendant notified the Court that the PSC granted four organizations whose executives submitted declarations "temporary exemption[s] . . . pending complete review of individual exemption applications." PSC Order at 7.

### B. Analysis

Plaintiffs have adequately demonstrated imminent irreparable injury largely due to the monetary harm they would suffer. Though monetary damages would usually supply an adequate remedy at law negating the availability of preliminary injunctive relief, the harm takes on special import where, as here, the Eleventh

Amendment precludes redressability. *See United States v. New York*, 708 F.2d at 93–94; *e.g.*, *UnitedHealthcare of N.Y., Inc. v. Vullo*, 2018 WL 4572243, at \*2 (S.D.N.Y. Sept. 21, 2018). "Where [monetary] damages cannot be later collected because the defendant enjoys [E]leventh [A]mendment immunity, the damages become irreparable."[3] *N.Y.S. Trawlers Ass'n v. Jorling*, 764 F. Supp. 24, 25–26 (E.D.N.Y.), *aff'd*, 940 F.2d 649 (2d Cir. 1991); *e.g.*, *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp. 2d 563, 572 n.6 (S.D.N.Y. 2009) (plaintiffs "unable to collect a judgment for monetary damages" due to "sovereign immunity under the Eleventh Amendment" may have irreparable injury "presumed" because "the only relief available . . . is injunctive."); *Am. Soc. of Composers, Authors, & Publishers v. Pataki*, 930 F. Supp. 873, 880 n.15 (S.D.N.Y. 1996). "[A]t least three circuits have held that unrecoverable damages may be irreparable harm, without reference to the amount of the loss." *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 2020 WL 7778037, at \*4 (S.D.N.Y. Dec. 30, 2020) (citing *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010); and *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)).

---

[3] At oral argument, Defendant pointed to the availability of state remedies, notwithstanding the Eleventh Amendment. Tr. of Oral Arg. at 24:10–14. Yet "in deciding whether a federal plaintiff has an available remedy at law that would make injunctive relief unavailable, federal courts may consider only the available *federal* legal remedies." *United States v. New York*, 708 F.2d at 93–94 (emphasis in original) (citing *Petroleum Expl., Inc. v. Commissioner*, 304 U.S. 209, 217 & n.8, 58 S.Ct. 834, 82 L.Ed. 1294 (1938)).

Beginning June 15, 2021, Plaintiffs will suffer unrecoverable losses increasing with time, and the enormity of the matter—six plaintiffs with multiple member organizations attacking a statute affecting one-third of all New York households—portends a lengthy litigation. *See, e.g.*, *Regeneron Pharms., Inc.*, 2020 WL 7778037, at *4 (quoting *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995)). The bulk of these losses will stem from lost income. Three of Plaintiffs' declarants estimate the ABA will reduce annual net income by at least $1 million each. Empire Tele. Decl. ¶ 8 ("net income loss of approximately $2 million per year"); Heart of the Catskills Decl. ¶ 17 ("top-line revenue will decrease by $1,364,000, and net cash flow will decrease by $1,031,000,"); Delhi Tele. Decl. ¶ 7 ("net income loss of about $1 million per year (or $90,000 per month)"). While a telecommunications giant like Verizon may be able to absorb such a loss, others may not: the Champlain Telephone Company, for example, "estimates that nearly half [approximately 48%] of [its] existing broadband customers will qualify for discounted rates," with each such customer "caus[ing] a monetary loss." Champlain Tele. Decl. ¶¶ 4, 6–7.

Beyond decreasing revenue, the ABA will increase costs. Providers must "make all commercially reasonable efforts" to advertise the ABA offers, N.Y. Gen. Bus. Law § 399-zzzzz(7), an ad campaign estimated to cost one provider (Verizon) between $250,000 and $1,000,000, Verizon Decl. ¶ 10. These advertising costs, like lost income, will continue in perpetuity. And the ABA also imposes upfront, one-time administrative costs – namely, those necessary to develop an eligibility verification system (as New York State has not provided one of its own) estimated to start at

$125,000, *id.* ¶ 8 – to say nothing of administrative costs to check on a participant's continuing eligibility, likely a perpetual obligation as well. Because providers will begin to face these consequences (revenue losses, additional costs) and bear these responsibilities (advertising logistics, eligibility determinations) on June 15, 2021, Plaintiffs' harms are therefore imminent.

Defendant impugns Plaintiffs' figures by arguing "none are supported by financial records of any sort." Def. Opp. at 8. Defendant cites no cases identifying the form of Plaintiffs' evidence as a problem, and courts have long granted preliminary injunctive relief by relying on affidavits supplying specific financial figures to demonstrate the magnitude of irreparable monetary injury. *E.g.*, *Nationwide Auto Transporters, Inc. v. Morgan Driveaway, Inc.*, 441 F. Supp. 755, 760 (S.D.N.Y. 1977); *see Regeneron Pharms., Inc.*, 2020 WL 7778037, at *4–5; *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction."). Moreover, the declarants provide these figures under the penalty of perjury, *see* 28 U.S.C. § 1746, which their positions qualify them to assert, Empire Tele. Decl. ¶ 1 (Chief Operating Officer); Verizon Decl. ¶ 1 (Executive Director of Home Segment Marketing); Heart of the Catskills Decl. ¶ 1 (President and General Manager); Hughes Network Decl. ¶ 1 (Senior Vice President for Regulatory Affairs); Delhi Tele. Decl. ¶ 1 (Vice President/General Manager); Champlain Tele. Decl. ¶ 1 (Controller). Plaintiffs have met their burden of proof.

To the extent Defendant faults Plaintiffs' declarants for predicting these harms as "likely," Def. Opp. at 8 & n.5, the law does not demand absolute prescience. The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Further, to the extent Defendant contests irreparable harm by relying on the purported "benefits" some providers "are likely to gain from the ABA," Def. Opp. at 9, these "benefits" actually *exacerbate* Plaintiffs' harms. Plaintiffs' declarants aver, and Defendant does not dispute, that many providers will furnish broadband service at ABA-mandated rates *at a loss*, meaning every "new customer" who takes advantage of the offer pushes a provider closer to (if not deeper in) the red. *E.g.*, Heart of the Catskills Decl. ¶ 15; Hughes Network Decl. ¶ 6.

The availability of exemptions similarly offers little in refute at this juncture. Once the ABA goes into effect, later exemption requests "do[] not relieve [a provider] from its obligations under the [ABA] until such time as the request is granted by the Commission." PSC Order at 4, 6. The granted temporary exemptions to some, but not all, of Plaintiffs' member organizations do not guarantee that such organizations will avoid irreparable injury. The temporary exemptions merely give the PSC more time to decide (viz. potentially deny) the requests, pursuant to "criteria and factors" not yet identified. *Id.* at 5; N.Y. Gen. Bus. Law § 399-zzzzz(5). Providers serving fewer than 20,000 households are *eligible* for, *not entitled* to, an exemption and require the PSC to find "compliance" would "result in unreasonable or unsustainable

financial impact." N.Y. Gen. Bus. Law § 399-zzzzz(5). *How* the PSC makes determination will remain unknown until after June 25, 2021 – the deadline to submit public comment to the PSC on the issue. Ex. B to Pls. June 1, 2021 Ltr.

Accordingly, when considered alongside the obvious downsides to noncompliance, which include possible initiation of dissolution proceedings,[4] Plaintiffs have demonstrated the ABA going into effect on June 15, 2021 compliance will result in irreparable injury absent preliminary injunctive relief.

## II. Likelihood of Success

Plaintiffs' likelihood of success depends on the strength of their preemption arguments, namely whether the ABA (a) conflicts with federal law by standing as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ("conflict preemption"), or (b) invades a field of regulation entirely occupied by federal law, with no room left for state law ("field preemption").

---

[4] At an April 7, 2021 press conference, Governor Cuomo indicated that the failure to comply with ABA would result in the loss of the provider's franchise in the State of New York. The Court notes that the New York Attorney General has long wielded the power to dissolve businesses which, "by the abuse of [their] powers contrary to the public policy of the state[,] ha[ve] become liable to be dissolved." *See People v. Oliver Sch., Inc.*, 206 A.D.2d 143, 147–48, 619 N.Y.S.2d 911 (N.Y. App. Div., 4th Dep't 1994) (citing *People v. Buffalo Stone & Cement Co.*, 131 N.Y. 140, 29 N.E. 947 (N.Y. 1892) and *People v. N. River Sugar Ref. Co.*, 121 N.Y. 582, 24 N.E. 834 (N.Y. 1890)).

This is not to suggest a violation of law should go unremedied. Rather, it lends credence to Plaintiffs' asserted "Hobson's choice" through which they face irreparable injury via the destruction of the business regardless of their choice to comply or not to comply. Dissolution constitutes irreparable harm because it threatens the viability of a provider's business. *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*, 588 F.2d 24, 28–29 (2d Cir. 1978).

### A.       Preemption Generally

"The purpose of Congress is the ultimate touchstone in every preemption case." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). Accordingly, a court's analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Id.* at 77 (alteration in original) (internal quotation marks omitted) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). However, if "a local government regulates in an area 'where there has been a history of significant federal presence,'" a purported exercise of historic police powers is not afforded deference. *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (quoting *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000)).

"Federal regulations have no less preemptive effect than federal statutes." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 188 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). A statute or regulation with plausible alternative preemption readings requires a court "to accept the reading that disfavors preemption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005).

There are two types of preemption asserted here: conflict preemption and field preemption. The Court begins with conflict preemption.

### B. Conflict Preemption

"[F]ederal law must prevail" over state law pursuant to the doctrine of conflict preemption if "'compliance with both state and federal law is impossible' or [if] 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015) (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)).

Before addressing the merits, it is necessary to review broadband service under the Federal Communications Act of 1934 (the "Communications Act"), 47 U.S.C. § 151 et seq., as amended by the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996). The Federal Communications Commission (the "FCC") has classified broadband internet under the Communications Act as either a Title I "information service" or a Title II "telecommunications service." The two classifications are mutually exclusive. 47 U.S.C. §§ 153(24), (53) ("The term 'information service' . . . does not include any use of any such capability for . . . the management of a telecommunications service."). "These similar-sounding [classifications] carry considerable significance: Title II [telecommunications services] entails common carrier status," whereas Title I information services do not. *Mozilla Corp. v. FCC*, 940 F.3d 1, 17 (D.C. Cir. 2019) (per curiam); *see* 47 U.S.C. § 153(51) (permitting treatment "as a common carrier . . . only to the extent that [an entity] is engaged in providing telecommunications services").

Prior to 2015 the FCC classified, and since 2018 has classified, broadband internet as a Title I "information service."  2015 Order ¶ 308;[5] 2018 Order ¶¶ 2, 26.[6] In the interim between 2015 and 2018, the FCC classified broadband as a Title II "telecommunications service."  Its present "information service" status prevents the FCC from imposing common carrier obligations on providers.  2018 Order ¶¶ 26–64; *see Mozilla Corp.*, 940 F.3d at 17 ("'[I]nformation services' are exempted from common carriage status and, hence, Title II regulation.").

### 1. Parties' Arguments

Plaintiffs contend the ABA conflicts with Congress's purposes and objectives in the Communications Act, as interpreted by the FCC and embodied in the FCC's 2018 Order.  The ABA, they say, "subjects the same broadband service that the Communications Act says should not be subject to common-carrier obligations to a form of *per se* common-carrier regulation: rate regulation."  Pls. Mem. at 12.  Plaintiffs compare the 2018 Order, in which the FCC announced a policy to "further[] its goal of making broadband available to all Americans" and exempted broadband from common carrier treatment, with the ABA, in which New York purported to reach the same goal through contradictory means.  *Compare* 2018 Order ¶¶ 86–87, *and* 2015 Order ¶¶ 382, 451 ("[W]e do not and cannot envision adopting new *ex ante* rate

---

[5]     Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601, ¶ 25 (2015) ("2015 Order").

[6]     Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd. 311, ¶ 21 (2018) ("2018 Order").

regulation of broadband Internet access service in the future . . . ."), *with* N.Y. Gen. Bus. Law § 399-zzzzz.

Defendant casts the ABA not as common carrier rate regulation, but as an "accessible pricing scheme." Def. Opp. at 17–18. By choosing a Title I classification, she says, the FCC does not deregulate broadband internet but, rather, "disclaim[s]" authority to regulate it altogether. Def. Opp. at 23; *see also* Hr'g Tr. at 65:16–23, *ACA Connects v. Becerra*, No. 18-cv-2684 (E.D. Cal. Feb. 23, 2021), Ex. H to Pls. Mem. [DE 16-8] ("*Becerra* Tr.") ("[R]einterpret[ting] broadband Internet as an information service covered by Title I . . . place[s] it outside the FCC's regulatory ambit . . . , a decision by the FCC that it lacked authority to regulate in the first place."). She reads the Communications Act's prohibition of common-carrier treatment of "information services" not to limit states, *see* 47 U.S.C. § 153(51), and argues that finding Congress intended preemption of state law there contravenes the express manner in which it did so elsewhere in the statute, Def. Opp. at 20 (citing 47 U.S.C. § 160(a)). Defendant contends the FCC's 2018 Order fails to express a policy preference strong enough to overcome New York's "historic police powers." Def. Opp. at 17–18.

## 2. Analysis

Plaintiffs have demonstrated a likelihood of success on the issue of conflict preemption. The Court rejects Defendant's contention that the FCC disclaimed "its authority to regulate broadband at all." Tr. of Oral Arg. at 17:15–17. In reclassifying broadband internet as a Title I information service, the FCC made the affirmative decision not to treat it as a common carrier. The FCC's affirmative decision is

different from an abdication of jurisdiction writ large, even though Title I may not confer as expansive of powers as, say, Title II and its grant to impose common-carrier obligations. *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978) ("The Court has previously recognized that where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute, States are not permitted to use their police power to enact such a regulation." (internal quotation marks omitted)); *Bethlehem Steel Co. v. New York State Labor Relations Board*, 330 U.S. 767, 774, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947) (holding federal nonregulation was not an "administrative concession that the nature of these appellants' business put" the particular subject matter "beyond reach of federal authority"). "Information-service providers . . . are not subject to mandatory common-carrier regulation under Title II, though the *Commission has jurisdiction to impose additional regulatory obligations under its Title I ancillary jurisdiction* to regulate interstate and foreign communications." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 976, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (emphasis added); *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 692–93 (D.C. Cir. 2005) (The FCC's "general grant of jurisdiction under Title I . . . encompasses 'all interstate and foreign communication by wire.'" (quoting *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)). "In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing

*which* jurisdictional base and *which* regulatory tools will be most effective in advancing the Congressional objective." *Computer & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198, 212 (D.C. Cir. 1982) (emphasis in original) (quoting *Phila. Television Broadcasting Co. v. FCC*, 359 F.2d 282, 284 (D.C. Cir. 1966)). The FCC's 2018 Order chooses Title I "information service" treatment for broadband internet and, in doing so, does not tender jurisdiction to the States to regulate interstate broadband providers as common carriers. Rather, the FCC binds itself to the confines of Title I jurisdiction, cementing its long-standing policy choice concerning the propriety of imposing common-carrier rate regulations upon broadband internet service.[7] The ABA stands as an obstacle to the accomplishment and execution of the FCC's reasoned decision to assure interstate broadband providers that no common-carrier rate regulations await them beyond the horizon.[8] *Crockett Tel. Co. v. FCC*, 963 F.2d 1564, 1566 (D.C. Cir. 1992) ("The FCC has exclusive jurisdiction to regulate interstate common carrier services including the setting of rates." (internal citation omitted)).

To be clear, the ABA is rate regulation, and rate regulation is a form of common carrier treatment. In Defendant's words, the ABA concerns "Plaintiffs' pricing

---

[7]    Previous to the 2015 Order, the FCC treated broadband internet as a Title I information service for "almost twenty years." 2018 Order ¶¶ 1–2. And even though Title II gave it the power to impose common-carrier rate regulations on broadband internet between 2015 and 2018, the FCC expressly decided against doing so. 2015 Order ¶¶ 382, 451 ("[B]ecause we do not and cannot envision adopting new *ex ante* rate regulation of broadband Internet access service in the future, we forbear from applying sections 201 and 202 to broadband services to that extent.").

[8]    The FCC reclassified broadband internet service under Title I "due to concerns that the [FCC] could reverse course in the future and impose [pursuant to Title II] a variety of costly regulations on the broadband industry—such as rate regulation." 2018 Order ¶ 101.

practices" by creating a "price regime" that "set[s] a price ceiling," which flatly contradicts her simultaneous assertion that "the ABA does not 'rate regulate' broadband services." Def. Opp. at 1, 6, 14, 18 (capitalization omitted). "Price ceilings" regulate rates. *E.g.*, *AT&T Co. v. FCC*, 974 F.2d 1351, 1352 (D.C. Cir. 1992) ("The FCC issued an order adopting a new method *for regulating the rates* charged by AT&T . . . that *established* a 'price cap index,' that serves as *a price ceiling* for each of three "baskets" of AT&T services." (emphasis added)); *see, e.g.*, *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 758–60, 768, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (recognizing the Federal Power Commission, "for purposes of rate regulation," devised a "rate structure" by setting "two area maximum prices," using the "legislative power to create price ceilings" (internal quotation marks omitted)); *see also, e.g.*, *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 486–87, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) ("The regulatory response in some markets was adoption of a rate-based method commonly called 'price caps,' as, for example, by the FCC's setting of maximum access charges paid to large local-exchange companies by interexchange carriers." (internal citations omitted)).

And rate regulation is a long-accepted method of regulating common carriers. *E.g.*, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231–32, 234, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) ("[T]he [Communications] Act establishes a *rate-regulation*, filed-tariff system for *common-carrier* communications." (emphasis added)); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 119, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) ("The ICC *regulates* interstate transportation by motor *common carriers* to

ensure that *rates* are both reasonable and nondiscriminatory." (emphasis added)). Defendant resists by noting the ABA is "limited to a discrete subset of customers," whereas common carriers offer service to the public indiscriminately and on general terms. Def. Opp. at 18. But "common carrier status" does not turn on a provider's offered service being "practically . . . available to the entire public." *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976). A regulation may impose common carrier obligations even if a service is "of practical use to only a fraction of the population" as a result of the obligation "limit[ing]" its benefits to those "eligible[]." *Id.* at 642. "The key factor is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use." *Id.*

Putting it all together, the ABA conflicts with the implied preemptive effect of both the FCC's 2018 Order and the Communications Act. The ABA's common carrier obligations directly contravenes the FCC's determination that broadband internet "investment," "innovation," and "availab[ility]" best obtains in a regulatory environment free of threat of common-carrier treatment, including its attendant rate regulation. 2018 Order ¶¶ 86–87, 101; *see Mozilla Corp.*, 940 F.3d at 49–55 (upholding the FCC's determination); the ABA thereby stands as an obstacle to the FCC's accomplishment and execution of its full purposes and objectives and is conflict-preempted.[9]

---

[9] As Defendant would have it, the FCC's 2018 Order reflects so profound a misunderstanding of Communications Act that, instead of *protecting* broadband internet providers from common carrier treatment and its attendant threat of rate regulation, it actually *exposes* them to fifty states-worth of such regulations.

The D.C. Circuit holding in *Mozilla Corporation* does not convince the Court otherwise. The *Mozilla* Court upheld the FCC's 2018 Order with the exception of the "Preemptive Directive," 940 F.3d at 19, 74–109, through which the FCC attempted to expressly preempt "any state or local requirements that are inconsistent with [its] deregulatory approach," 2018 Order ¶¶ 194–204. The *Mozilla* Court held that the FCC could not *expressly* preempt such state or local requirements pursuant to its Title I authority because Congress did not vest therein the *power to expressly preempt.* *See Mozilla Corp.*, 940 F.3d at 83 ("[N]othing [] empower[s] the [FCC] to engage in express preemption in the 2018 Order."). The FCC may regulate only so far as Congress grants it "express statutory authority" and "ancillary authority," each of which the FCC lacked in trying to expressly preempt under Title I. *Id.* at 74–76. The Preemptive Directive's reach was all-the-more-so *ultra vires* because it entered the *intra*state communications hemisphere "over which Congress expressly denied the [FCC] regulatory authority." *Id.* at 77–78 (internal quotation marks omitted); *id.* at 82 (noting the Preemptive Directive purported to make "a categorical determination

---

Moreover, if Defendant's reading of *Mozilla Corporation* is correct, the FCC's decision to "reclassif[y broadband] *away* from public-utility style regulation" survived the D.C. Circuit's application of the "arbitrary-and-capricious" standard of review despite *causing more* public-utility style regulation. 940 F.3d at 50–55 (emphasis added) (internal quotation marks and citations omitted). The Court has its doubts. How could the FCC's 2018 Order make a "rational connection between the facts found [*i.e.*, public-utility style regulation impedes investment, innovation, and availability] and the choice made [*i.e.*, to classify broadband under Title I]" if, as a matter of law, Title I treatment unfetters fifty state sovereigns to impose their own public-utility style regulations? *See id.*

that any and all forms of state regulation of intrastate broadband would inevitably conflict with the 2018 Order").

*Mozilla*'s holding does *not* preclude or revoke the 2018 Order's implicit preemptive effect. The D.C. Circuit concluded its decision by noting "it would be wholly premature to pass on the preemptive effect, under conflict or other recognized preemption principles, of the remaining portions of the 2018 Order." *Id.* at 86. Those same preemption principles are implicated by the ABA. And parallel to the D.C. Circuit's prediction, when faced with the ABA, Plaintiffs have "explain[ed] how [that] state practice actually undermines the 2018 Order," thus "invok[ing] conflict preemption." *Id.* at 85.[10]

## C.    Field Preemption

Field preemption reflects a congressional decision "'to foreclose any state regulation in the area,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015) (quoting *Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)). Where "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state

---

[10]    To the extent Defendant relies on the Eastern District of California's Oral Ruling in *ACA Connects v. Becerra*, No. 18-cv-2684 (E.D. Cal. Feb. 23, 2021), for its holding on conflict preemption, such reliance is misplaced. The California Attorney General defeated the preliminary injunction motion by, in part, "pointing out" that the statute there did "not regulate how much providers can charge their customers because providers can charge the user as much or as little as they like for the service and, thus, there is no conflict with the Act." *Becerra* Tr. at 67:18–21. The ABA's express goal is to regulate how much providers can charge.

legislation,'" it may not only impose federal obligations "but also confer a federal right to be free from any other [state law] requirements." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1480–81, 200 L.Ed.2d 854 (2018) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986)).

Laws governing "interstate communication services" comprise the field purportedly preempted here.

### 1.   Parties' Arguments

Plaintiffs argue federal law preempts the field of interstate communications services, citing precedent finding Congress's "intent" in the Communications Act's "broad scheme" of regulation over "interstate service by communications carriers." *Ivy Broadcasting Co. v. AT&T Co.*, 391 F.2d 486, 490–91 (2d Cir. 1968) (citing Supreme Court cases); *see Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699–700, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (discussing *Southwestern Cable Co.*, 392 U.S. 157 (1968)). Plaintiffs' asserted "field" is demarcated in 47 U.S.C. § 152:

> (a) The provisions of this chapter shall apply to all *interstate and foreign communication* by wire or radio . . . , which originates and/or is received within the United States, and to all persons engaged within the United States in such communication . . . .

> (b) . . . [N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with *intrastate communication service* by wire or radio of any carrier . . . .

47 U.S.C. §§ 152(a) & (b) (emphasis added). Because the ABA defines "broadband service" in the exact same way as the FCC, Plaintiffs say, New York impermissibly seizes jurisdiction outside its "intrastate services" boundary. *Compare* N.Y. Gen. Bus.

Law § 399-zzzzz(1), *with* 2018 Order ¶ 21 (explaining that the FCC "continue[s] to define" broadband services in the same manner as it did in (now-repealed) 47 C.F.R. § 8.11(a) and reciting the definition), *and* 2015 Order ¶ 25 (defining "broadband internet access service").

Defendant opposes by observing "[t]he [Communications] Act establishes . . . a system of dual state and federal regulation," *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), with states retaining jurisdiction over intrastate communication services and through which New York may enact the ABA's "purely intrastate affordable-pricing scheme," Def. Opp. 14. Defendant contends that Plaintiffs' reading of 47 U.S.C. § 152(a) impermissibly renders other Communications Act provisions "superfluous." *Id.* at 15. Defendant also cites circuit court precedent outside the Second Circuit that rejects field preemption even where "states seek to regulate interstate telecommunications services." *Id.* at 13 (capitalization and emphasis removed) (citing *Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016); *Johnson v. American Towers, LLC*, 781 F.3d 693 (4th Cir. 2015); *In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d 1188 (10th Cir. 2010); *In re NOS Commc'ns*, 495 F.3d 1052 (9th Cir. 2007)).

## 2.    Analysis

Plaintiffs have demonstrated a likelihood of success on the merits based on field preemption. The ABA is not a "purely intrastate affordable-pricing scheme," nor is it reasonable to read its statutory text in that manner: It covers providers with "the capability to transmit data to and receive data from *all or substantially all*

*internet endpoint*s." N.Y. Gen. Bus. Law § 399-zzzzz(1) (emphasis added). As implied by a cousin term, the "world wide web," broadband internet connects New York State users to internet endpoints well beyond New York's borders. For example, the household from which this New York-based federal Court, working from home, can so-order the parties' briefing schedule on the Internet-based ECF docket, and, in doing so, communicate with Plaintiffs' Washington, D.C.-based counsel, with proof documented on the Notice of Electronic Filing receipt. *E.g.*, Order entered May 5, 2021. The ABA's plain terms apply (absent an exemption) to the telecommunications provider transmitting this interstate communication. In other words, the ABA is not confined to *intra*state communications services.

Indeed, the ABA borrowed its definition the "broadband services" from the FCC. The FCC before 2015, between 2015 and 2018, and since 2018 has

> continue[d] to define "broadband Internet access services" as a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints,

2018 Order ¶ 21 (footnote omitted); *see* 2015 Order ¶ 25 ("Consistent with the [FCC's] 2010 Order . . ."), which is reprinted in N.Y. Gen. Bus. Law § 399-zzzzz(1). While the Court need not, and will not, at this stage hold that all broadband internet services are categorically *inter*state, it suffices to say that the ABA clearly wanders beyond the *intra*state communications line, with no provisions reasonably inferable as limiting (or even trying to limit) its reach.

Defendant calls this view "mistaken" because the ABA is not "an interstate-communication statute" but, rather, "an intrastate pricing regulation." How the ABA

is "purely intrastate" is counterintuitive, if not implausible. *See* Def. Opp. at 14–15. It covers broadband internet communications from "all Internet endpoints," including those sent from or to endpoints outside New York State's borders; the ABA is not confined to communications between two New York endpoints. It covers every provider "engaged" in "interstate and foreign [broadband internet] communication," 47 U.S.C. § 152(a), so long as the provider serves New York customers, not just the "many" providers operating "exclusively within the State" who thus serve only New York customers, Def. Opp. at 14. The sole basis on which Defendant relies to call the ABA "intrastate" is its applicability only to "[c]ompanies that have chosen to provide service in New York." *Id.* But *any* state law can be construed as applicable only to those subject to that state's jurisdiction, which, accordingly, does not make it "intrastate." "The key to [the FCC's] jurisdiction," the line between inter- vs. intrastate, "is the nature of the communication itself rather than the physical location of the technology" or the consumers served. *See New York Tel. Co. v. FCC*, 631 F.2d 1059, 1066 (2d Cir. 1980).

Because the ABA regulates within the field of interstate communications, it triggers field preemption. Binding Second Circuit decisions are clear: the Communications Act's "broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress *to occupy the field* to the exclusion of state law." *Ivy Broadcasting Co.*, 391 F.2d at 490–91 (emphasis added) (analyzing *Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 40 S.Ct. 69, 64 L.Ed. 118 (1919) and *Western Union Tel. Co. v. Boegli*,

251 U.S. 315, 40 S.Ct. 167, 64 L.Ed. 281 (1920)); *e.g.*, *GTE Serv. Corp. v. FCC*, 474 F.2d 724, 730–31 (2d Cir. 1973) ("The courts, however, have uniformly and consistently interpreted the [Communications] Act to give the [FCC] broad and comprehensive rule-making authority in the new and dynamic field of electronic communication."); *cf.*, *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 416 (2d Cir. 2002) ("When federal law preempts state law, it prohibits a state or local governmental entity 'from regulating within a protected zone, whether it be a zone protected and reserved for market freedom . . . or for [federal agency] jurisdiction.' Federal regulation of interstate and foreign communications plainly preempts much of the field of wireless broadcasting." (ellipses and alteration in original) (quoting *Bldg. & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226–27, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993))).

Defendant contends that subsequent courts have called these Second Circuit decisions' "reasoning into question," *id.* (citing *Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998)), a contention with which the Court disagrees based on the arguments presented.[11] However, it is not this Court's prerogative to disregard *Ivy Broadcasting* when assessing Plaintiffs' likelihood of success.

---

[11]      In *Global NAPs, Inc. v. Verizon New England, Inc.*, for example, the Second Circuit noted that Vermont Public Service Board "made no attempt to set rates or charges for" an interstate communication service and therefore "narrowly sidestepped encroachment on the FCC's jurisdiction to set rates on interstate communications." 454 F.3d 91, 102 n.10 (2d Cir. 2006) (citing *Ivy Broadcasting*); *see also Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (FCC has "comprehensive authority" and "'broad responsibilit[y]' to regulate all aspects of interstate communication by wire or radio by virtue of . . . 47 U.S.C. § 152(a)"); *United States v. Southwest Cable Co.*, 392 U.S. 157, 167–68, 88 S.Ct.

And while complete preemption[12] and field preemption "must be distinguished," *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272–73 & n.7 (2d Cir. 2005), despite Defendant's reliance on cases involving the former to contest the latter, *see* Def. Opp. at 16–17; *see* Pls. Reply at 7 & n.7, the *Ivy Broadcasting* Court held Congress *both* field-preempted *and* complete-preempted the realm of interstate communications:

> It seems reasonable that the congressional purpose of uniformity and equality of rates should be taken to imply uniformity and equality of service. The published tariff rate will not be uniform if the service for which a given rate is charged varies from state to state according to differing state requirements. It seems to us that the congressional purpose can be achieved only if a uniform federal law governs as to the standards of service which the carrier must provide and as to the extent of liability for failure to comply with such standards.

391 F.2d at 490–91. In other words, Congress set aside interstate communications as an area in which a uniform federal law governs "standards of service" (field preemption) and "extent of liability" (complete preemption). *See id.*

---

1994, 20 L.Ed.2d 1001 (1968) (FCC "expected to serve as the single Government agency with unified jurisdiction and regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio" and Communication Act's "terms, purposes, and history all indicate that Congress formulated a unified and comprehensive regulatory system for the (broadcasting) industry" (internal quotation marks omitted)).

[12] "Complete preemption is distinct from ordinary or 'defensive' preemption, which includes express, field, and conflict preemption." *Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201, 206 n.2 (2d Cir. 2019); *see Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272–73 & n.7 (2d Cir. 2005) ("The complete-preemption doctrine must be distinguished from ordinary preemption."). Complete preemption is where "certain federal statutes are construed to have such 'extraordinary' preemptive force that state-law claims coming within the scope of the federal statute are transformed, for jurisdictional purposes, into federal claims." *Sullivan*, 424 F.3d at 273.

Defendant's position stems from reading 47 U.S.C. § 152(a) to speak "entirely on federal—not state—authority." Def. Opp. at 15; *see also Becerra* Tr. at 63:3–65:7. The Court finds it hard to square that view with the Supreme Court's decision in *Louisiana Public Service Commission v. FCC*, which described the Communications Act as dividing communications services into "two hemispheres—one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction." 476 U.S. 355, 357, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (emphasis removed);[13] *Crockett Tel. Co.*, 963 F.2d at 1566 ("The FCC has exclusive jurisdiction to regulate interstate common carrier services including the setting of rates." (citing 47 U.S.C. § 152)). The FCC's jurisdiction would hardly be "plenary" if it loses, to the states' gain, the right to make rules regarding certain interstate communications services when the FCC alters, through formal rulemaking procedure, the Title of the Communications Act under which it continues to effect its longstanding policy of nonregulation of those communications. *See* 83 Fed. Reg. 7852 (Apr. 23, 2018);

---

[13] The Supreme Court observed "the realities of technology and economics belie [] a clean parceling of responsibility" between federal interstate matters and state intrastate matters." *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 360 (where infrastructure "provid[ing] intrastate service is also used to provide interstate service" it is "conceivably within the jurisdiction of both state and federal authorities"). But any unavoidable overlap is not an invitation for concurrent state regulation of *inter*state communications because the "impossibility exception" gives the FCC jurisdiction where it is "not possible to separate the interstate and the intrastate components of the asserted [FCC] regulation." *Mozilla*, 940 F.3d at 77 (quoting *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 375 n.4). Defendant does not suggest the ABA operates within the overlap and, even if she had, the ABA is plainly *inter*state regulation.

*Plenary*, Black's Law Dictionary (11th ed. 2019) ("Full; complete; entire"); *cf.*

*Bethlehem Steel Co.*, 330 U.S. at 776 (holding there is no state-federal "concurrent

jurisdiction" where a federal agency "has jurisdiction of the industry" because,

otherwise, "action by one necessarily denies the discretion of the other. The second

to act either must follow the first, which would make its action useless and vain, or

depart from it, which would produce a mischievous conflict"). The field of interstate

communications gets no smaller, and no less exclusive, when the FCC does so.

*Mozilla Corp.*, 940 F.3d at 77 (holding that § 152(a) identifies "communications

matters falling under the [FCC's] authority" and § 152(b) identifies "those *remaining*

within the States' wheelhouse," with "the impossibility exception" helping to "police

the line between" the two (emphasis added)). The 2018 Order does *not* say broadband

internet no longer reflects an interstate communication service.

For that reason, this Court respectfully believes the Eastern District of

California in *ACA Connects v. Becerra* has it backwards. The Communications Act

does *not* "specifically le[ave] out certain types of interstate communications [*e.g.*,

those transmitted by information services] from the FCC's jurisdiction." *Becerra* Tr.

at 63:18–20. Rather, the Communications Act specifically leaves out certain *types of

jurisdiction* (*e.g.*, Title II authority to impose common carrier obligations), *but not*

jurisdiction writ large, over interstate communications transmitted by information

services.

Therefore, Plaintiffs has demonstrated a likelihood of success on the issue of field preemption.[14]

## III.  Balance of Equities and the Public Interest

Second Circuit precedent suggests that a plaintiff "may be able to show that a preliminary injunction is warranted on the strength of these first two factors alone," *i.e.*, without considering the "balance of the equities" and the "public interest." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 n.38 (2d Cir. 2020). Plaintiffs likely have done so here.  But pursuant to Supreme Court instruction, *see id.* (citing *Winter*, 555 U.S. at 20); *Pharaohs GC, Inc.*, 990 F.3d at 225, the Court nevertheless analyzes these last two factors, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

The Court also holds these two factors favor preliminary injunctive relief. While the stated purpose of the ABA is to expand access to broadband internet, that is not to say it is the sole legislative effort doing so.  Plaintiffs discuss several federal programs allocating billions of dollars to achieve that same end: the Lifeline program, the Emergency Broadband Connectivity Fund, the American Rescue Plan.  Pls. Mem.

---

[14]    At oral argument, Defendant contended that Communications Act provisions "expressly preempt[ing] state action would [] not be required if there was field preemption," suggesting the former rules out the latter. Tr. of Oral Arg. at 25:20–22. But a federal law's express preemption clause "does not immediately end the [preemption] inquiry because the question of the substance and scope of Congress' displacement of state law still remains.  Preemptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Altria Grp., Inc.*, 555 U.S. at 76–77.

at 21–24; Pls. Reply at 9–10. While Defendant argues that the New York Legislature determined these federal benefits were insufficient, that determination was made prior to the FCC's April 29, 2021 announcement that the Emergency Broadband Benefit would become on effective May 12, 2021.[15]

Additionally, the evidence before the Court suggests the ABA may not achieve its desired effect – and in fact reduce Internet access statewide. Empire Telephone Corporation's declarant avers that Empire will have to cancel expansion projects which, if completed, would result in Empire "serv[ing] more than 20,000 households," thereby disqualifying Empire from an exemption. Empire Tele. Decl. ¶ 10. These projects include "building out the network to reach the City of Binghamton" and "building more than 330 miles of fiber optic network that would be capable of servicing nearly 1,100 homes" in Livingston County. *Id.* ¶¶ 6–7. Likewise Delhi Telephone Company will "be forced to abandon efforts to expand its rural broadband coverage, . . . set[ting] it back in terms of growing its subscriber base." Delhi Tele. Decl. ¶ 2. Heart of the Catskills Communications Inc. would have to "forgo expansion of its network" which would have reached unserved customers. Heart of the Catskills Decl. ¶¶ 3, 19.

Given the foregoing, a balance of the equities and the public interest support a preliminary injunction keeping the status quo.

---

[15] Public Note, FCC, Wireline Competition Bureau Announces Emergency Broadband Benefit Program Launch Date (Apr. 29, 2021), https://docs.fcc.gov/public/attachments/DA-21-493A1.pdf.

## IV. Rule 65(c) Security

A court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm . . . ." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotation marks omitted). The Court exercises its discretion not to require Plaintiffs' to post a bond. Defendants have neither requested one, nor is there any "proof of a likelihood of harm" to New York that could result from granting the injunction. *E.g.*, *Regeneron Pharms., Inc.*, 2020 WL 7778037, at *14; *Town of Brookhaven v. Sills Rd. Realty LLC*, 2014 WL 2854659, at *11 (E.D.N.Y. June 23, 2014).

## CONCLUSION

For the reasons discussed above, Plaintiffs' motion for a preliminary injunction is granted. The Court will enter a separate Preliminary Injunction Order enjoining Defendant from enforcing the ABA.

**SO ORDERED.**

Dated: Central Islip, New York            s/ Denis R. Hurley
      June 11, 2021            Denis R. Hurley
                                    United States District Judge